Argued October 4, 1950; affirmed February 7; petition for
rehearing denied February 28, 1951

# STATE OF OREGON *v.* LELAND

227 P. (2d) 785

*Thomas H. Ryan* argued the cause for appellant. On the brief were Ryan & Pelay and Donald McEwen, of Portland.

*John R. Collier*, Deputy District Attorney, of Portland, argued the cause for Respondent. With him on the brief were John B. McCourt, District Attorney, and J. Raymond Carskadon, Deputy District Attorney, of Portland.

Before LUSK*, Chief Justice, and BRANDt†, ROSSMAN, HAY, LATOURETTE and WARNER, Justices.

LUSK, J.

The defendant, Morris Leland, was indicted for first degree murder. He entered a plea of not guilty and also gave notice of an intention to prove insanity. Upon the trial the jury returned a verdict of guilty without recommendation of life imprisonment. The death penalty automatically followed, and the defendant has appealed assigning twenty alleged errors.

The circumstances of the crime, as revealed by the defendant's confessions, were as follows: At about the hour of a quarter after four on the morning of

---

* Chief Justice when this case was argued.
† Chief Justice when this opinion was rendered.

Friday, August 5, 1949, the defendant accosted Thelma Taylor, a fifteen-year-old girl, on a street in the St. Johns district of the city of Portland, and induced her to accompany him to a lonely spot on the east bank of the Willamette River. At the time of their meeting the girl was on her way to board a bus which would have taken her to the vicinity of Hillsboro where she intended to pick beans. She remained in the company of the defendant until he murdered her on the following morning. On Friday he attempted to have sexual intercourse with her, but desisted on discovering that she was a virgin and that the act hurt her. Sometime during the course of that day he picked up a piece of steel eighteen inches long and one-half inch in diameter with the idea of killing the girl with it. He was also armed with a long knife, which he carried in a scabbard in his belt. The defendant and the girl slept Friday night on the river bank in a clump of trees, and the next morning he killed her by striking her over the head several times with the steel bar and stabbing her twice in the body. He covered her body with drift wood, wiped his finger prints from a lunch pail which the girl had carried, threw the steel bar and knife into the river, disposed of the butts of cigarettes which he had smoked, and left the place.

At about two o'clock on the morning of August 11 the defendant was arrested for the theft of an automobile and brought to the Portland police station. There he told a sergeant of police that he wished to talk to a homicide officer because he had killed a girl. He led the police to the scene of the crime, freely telling them the story of its commission. Later in the morning he was questioned by John R. Collier, deputy district attorney for Multnomah County, and Captain William D.

Browne, of the Portland police, and made a full confession, which was taken down by a stenographer. The confession was transcribed and the defendant signed it. Still later in the day he told a police officer that he desired to make a written statement, was furnished pen and paper, and at 10:00 P. M. wrote out and signed another confession, which differs in some details from the statement previously signed by him.

The defendant did not testify, and there is no contradiction in the evidence of the foregoing facts save minor discrepancies in the defendant's own statements. What the officers found at the scene of the crime corroborated the defendant's confessions.

The defendant being without funds, the court appointed counsel to defend him. In the best tradition of the Bar these gentlemen discharged their duty to their client with zeal and ability, both in the trial court and here. That their efforts have been unsuccessful is no reflection upon them, for the crime was so wanton and inhuman, and so amply proved, that any other verdict than one of guilty would have been a shocking miscarriage of justice, while the rights of the defendant were fully protected by a careful and able judge and no errors prejudicial to him were committed.

The first assignment of error is based upon the court's refusal to grant a postponement of the trial. The indictment was returned August 18, 1949. On August 22 Messrs. Thomas H. Ryan and Anthony Pelay, Jr., were appointed defendant's counsel by the court. On August 30 defendant's counsel served on the district attorney a notice of his intention to show in evidence that he was insane and mentally defective at the time of the commission of the alleged crime. On September 8 counsel for the defendant filed a written

motion for ninety days' postponement of the date of trial, the case having been set for trial on September 22. The grounds of the motion were that the defendant needed additional time to prepare the case and to have proper psychiatric examination and study; that, owing to the extent and character of the publicity given the case in the Portland newspapers, the defendant would be unable to receive a fair trial at the time set; and that counsel had numerous other cases in the Supreme Court and the Circuit Court. The Circuit Court denied the motion for a ninety-day postponement, but reset the case for the 24th of October. On October 12 the defendant filed a motion for a sixty-day postponement from October 24 on grounds similar to those stated in the previous motion, and on the further grounds that the defendant needed more time in which to obtain the medical records from the Veterans Administration and other pertinent data concerning defendant's medical and psychiatric record, and that the psychiatrist employed by the defendant needed additional time to prepare himself to testify.

The court granted a further continuance until October 27, on which day the trial commenced. It appears that, on the hearing of the motion filed October 12, Mr. Ryan and the judge hearing the motion agreed that the judge might ascertain from Dr. Henry H. Dixon, the psychiatrist employed by the defendant, whether Dr. Dixon would be ready to testify by October 27, and that Mr. Ryan would abide by the judge's decision, and that the judge was told in substance by Dr. Dixon that he would be ready to testify by that time. In fact, Dr. Dixon was not called as a witness until November 4, nine days after the trial commenced. It further appears that the defendant was able to obtain and intro-

duce in evidence the medical records of the Veterans Administration relating to the defendant as well as other medical and psychiatric records.

■ The trial court's ruling on a motion for postponement will not be disturbed on appeal save for manifest abuse of discretion. *State v. Mizis,* 48 Or. 165, 175, 85 P. 611, 86 P. 361, and Oregon cases there cited. Actually, sixty-five days elapsed from the day defendant's counsel were appointed until the commencement of the trial and seventy-four days before Dr. Dixon took the witness stand. There is nothing in the record to indicate that Dr. Dixon was not fully prepared to testify at that time. The record shows that on the trial Mr. Ryan renewed the motion for postponement, and, in the course of a statement to the court with reference to the proceedings on the original presentation of the motion, said: ''I disclosed to the court that Dr. Dixon, a psychiatrist whom we had employed in the case, would not be ready for trial, according to his information to us, for two weeks after the 24th of October''. In fact, two weeks elapsed after October 24 before Dr. Dixon was called to testify.

The fears of counsel that they would be unable to obtain evidence, such, for example, as the records of the Veterans Bureau, proved to be groundless. It is not now claimed that the defendant was unable to obtain any evidence, otherwise available, because the postponement requested was denied.

The newspaper articles referred to in the motion have not been brought to this court. But, whatever may have been their character, we have nothing but the unsupported statement of counsel that their publication had so excited the public mind that the defendant could not obtain a fair trial unless the requested post-

ponement was granted. The examination of the jurors on their voir dire (save of two jurors with reference to other points) has not been brought to this court, and so we may safely assume that no such inflamed state of the public mind was disclosed by such examination as is claimed by the defendant.

██ We do not question counsel's good faith in seeking a postponement, but we may observe that frequently, when all other defenses fail, delay is the favorite expedient of the accused in a criminal case to escape paying the penalty for his crime. The defendant is, of course, entitled to a reasonable time to prepare for trial. He is also entitled to a fair trial, which has been well defined as "a trial before an impartial judge, an honest jury, and in an atmosphere of judicial calm." 14 Am. Jur., Criminal Law, 853, § 130; *State v. Gossett,* 117 S. C. 76, 108 S. E. 290, 16 A. L. R. 1299. The Gossett case is cited by counsel for defendant, but it falls far short of supporting their contention. In that case the court held unconstitutional a law which authorized the governor of the state, upon application of the local prosecuting officer, to order an extra term of court. The case was one in which the defendants, who were accused of rape, were brought to trial three days after their indictment and under such circumstances as to lead the court to say of the procedure provided in the section held invalid, that it "is a bald concession to the spirit of mob law, and presents the spectacle of the law, strong and mighty, bowing to the despotism of the mob, which has been declared to be greater than the tyranny of a despot." It appears from the opinion that the foreman of the grand jury of Abbeville County (in which the defendants were indicted) made affidavit to the effect that the defendants could not safely be

brought to that county on account of prevailing hot sentiment; that the sheriff of the county recommended military protection during the trial that was approaching; and that more than 100 affidavits were submitted by the defendants upon their motion for a change of venue on the ground that a fair trial could not be had. Nothing in the record before us even faintly resembles the situation portrayed by the foregoing recital. In our opinion, the defendant had ample time in which to prepare his defense, and there is no such showing of prejudice against him as to warrant the conclusion that he could not, and did not, have a fair trial. The court did not err in denying the motion for a postponement.

Prior to the date of trial the defendant served upon the district attorney a motion to require the latter to disclose and make available to counsel for the defendant "the alleged confession of the defendant and all records pertaining to the death of Thelma A. Taylor taken by the coroner's office." While not specified in the motion, the briefs, as well as the proceedings in the court below, show that the motion was directed only to the confession which was taken down by a stenographer, and not to the one which the defendant later wrote out in his own hand. The former is State's Exhibit 15, the latter State's Exhibit 18. This motion does not appear to have been argued until immediately before the commencement of the trial when defendant's counsel orally moved for an order permitting them to examine the confession. The court denied the motion, and this ruling, so far as the confession alone is concerned, is made the basis of an assignment of error. The question arose again upon the trial before the confession was introduced in evidence, and at that time

the court informed counsel for the defendant that, if they desired "an additional recess" in order to go over the confession after it had been offered and received, he would grant it. The basis of the motion was, as stated in the defendant's brief, "to enable defendant's counsel to properly prepare their case in the light of the defendant's inability to aid counsel because of his mental condition", and particularly that, as defendant was relying on the defense of insanity, an inspection of the confession by defendant's experts was needed in order that they might prepare themselves properly to testify. It sufficiently appears that the only psychiatrist upon whom defendant's counsel were depending for this purpose was Dr. Dixon, who took the stand two days after the confession had been identified as an exhibit in the case.

So far as we are advised, the question presented by this assignment of error has never been determined by this court. It is a different question from that decided in *State v. Yee Guck*, 99 Or. 231, 195 P. 363, and *State v. Brake*, 99 Or. 310, 195 P. 583, which dealt with the unsigned memoranda of statements made by witnesses for the state. It was held that, since such memoranda were not admissible in evidence, their production could not be compelled on the trial as an aid to cross-examination for the purpose of impeachment. *State v. Steeves*, 29 Or. 85, 43 P. 947, is likewise distinguishable because the point in that case was that, where the state sought to impeach its own witness by inconsistent statements in a written confession signed by him, it was required to show the witness the writing in accordance with the terms of § 4-712, O. C. L. A.

We will consider the decisions from other states. *People v. Becker*, 210 N. Y. 274, 104 N. E. 396, cited by

the defendant, holds that, where it developed on the cross-examination of an avowed accomplice testifying for the state, that the witness had signed a written confession which was in the possession of the district attorney, and the defendant's attorney demanded production of the confession solely for the purpose of impeachment of the witness, it was error to deny the request. The Becker case is not in point because it turns upon the right to inspection at the trial as an aid to cross-examination, a question not before us.

In *People ex rel. Lemon v. Supreme Court,* 245 N. Y. 24, 156 N. E. 84, 52 A. L. R. 200, the court held that a trial judge exceeded his powers in ordering the prosecuting attorney to make available for inspection by counsel for the defense, in a murder case where poisoning of the victim was charged, all reports made to the district attorney of chemical analysis of the body of the deceased and other similar documents. As in our own cases, the court put its decision on the ground that the documents were not admissible in evidence. The opinion was written by Judge Cardozo and will be referred to again for its discussion of the very question which we must decide here.

*State v. Tippett,* 317 Mo. 319, 296 S. W. 132, cited by the defendant, goes so far as to hold that the defendant in a criminal case has the right to compel production before trial of a written statement given to the prosecuting attorney by a witness. This decision, of course, is out of harmony with the law as previously laid down by this court, and the Missouri court conceded its inability to find an authority in point.

There are a number of cases which deal with confessions signed by the defendant and admissible in evidence. *Davis v. State,* 99 Tex. Crim. Rep. 517, 270

S. W. 1022, holds that there is no law which would require the state at the beginning of the trial to deliver the defendant's confession to his counsel. A similar holding in *Goode v. State,* 57 Tex. Crim. Rep. 220, 123 S. W. 597, reasons that the confession sought to be inspected was not a public document but "a part of the proceedings of the grand jury, and for that reason subject to the seal of secrecy until and unless offered as a criminating circumstance or testimony against appellant." The Ohio Supreme Court denies the existence of the power in *State v. Yeoman,* 112 Oh. St. 214, 147 N. E. 3, where it reversed the trial judge for ordering the prosecuting attorney to permit the attorneys for the defendant to inspect his confession. In Washington the power is held to be discretionary with the trial court. *State v. Clark,* 21 Wash. 2d 774, 153 P. 2d 297.

The strongest decision for the defendant is *State v. Dorsey,* 207 La. 928, 955, 22 So. 2d 273, which holds that the court's refusal of a pre-trial demand by the defendant for permission to inspect and make a copy of a written confession, which the state intended to introduce in evidence, was tantamount to depriving him of a fair and impartial trial and thus a violation of his constitutional rights. The court conceded that the power did not exist at common law, cited a number of cases opposed to its conclusion and none which supported it, and was able to point to no statutory authority. The decision seems to have been largely influenced by Wigmore's discussion of the subject, VI Wigmore on Evidence (3d ed.) 395, § 1850, and an account, quoted in Wigmore, by the Hon. Charles S. Whitman, of the pre-trial practice in England under which all the evidence of the Crown is disclosed in the

preliminary examination before the magistrate. Among other things Governor Whitman said:

"* * * All of the evidence in the possession of the Crown is in the possession of the counsel for the defendant. He knows all that the Crown knows. He has all the evidence in his possession before the witness goes on the stand. He has all the evidence that can be presented in that court at trial, before the trial begins. * * *"

After quoting the foregoing the court proceeded:

"From the above it would appear that the common-law rule on this point has been changed or greatly relaxed in England as a result of this pre-trial procedure. And we see no necessity for following the old common-law rule in this State, in the absence of any prohibitory statute or decisions of this court on the point, solely and only for the reason that several states in the Union continue to do so."

The defendant in the Dorsey case claimed in his motion that knowledge of the contents of the confession was important and material in the proper preparation of his defense; and we take it that the rule of that case is that, whenever application on such a ground for inspection of a confession signed by the defendant is refused, the court's action is in effect the denial of the right to a fair and impartial trial.

Counsel for the defendant invoke § 10-401, O. C. L. A., which provides in part:

"The court or judge thereof, while an action or suit is pending, may order either party to give the other, within a specified time, an inspection and copy, or permission to take a copy of any book, document, or paper in his possession, or under his control, containing evidence or matters relating to

the merits of the action or suit, or the defense therein.''

In *State v. Yee Guck,* supra, the court indicated obiter that this section, though it is a part of the Code of Civil Procedure, is applicable in criminal cases by saying: ''It would seem also that Section 533, Or. L. (now § 10-401, O. C. L. A.), would be applicable in a proper case to the matter in hand''. The opinion proceeded: ''The power of the court under this section is clearly discretionary. The language is not mandatory.'' (99 Or. 236)

Judge Cardozo in *People ex rel. Lemon v. Supreme Court,* supra, while leaving the question open, suggested that there may be ''a supervisory jurisdiction, as yet unplumbed and unexhausted, in respect of criminal prosecutions'' to order discovery in cases of this kind. And, referring to the New York statute that the rules of evidence shall be the same in criminal as in civil causes, he wrote: ''The provisions of the Civil Codes for the discovery of documents are not rules of evidence in the strict sense. They are closely akin, however, to such rules, for they govern and define the remedies whereby evidence is made available.'' We have a similar provision in this state respecting evidence in civil and criminal actions and proceedings. § 26-932, O. C. L. A. Judge Cardozo's discussion of the subject shows that, while at common law the power of the criminal courts to compel production of documents admissible in evidence is denied, ''Later cases exhibit a more conciliatory tendency where the document is one that may be received as an exhibit.'' Among other illustrations is a case where the exhibit is the basis of the charge, as, for example, where the indictment is

for sending a threatening letter. *Rex v. Harrie,* 6 Car. & P. 105. See cases in the annotation at 52 A. L. R. 207.

■ We are not prepared to go so far as the Louisiana court in *State v. Dorsey.* Not only do we fail to find either at common law or under statute authority for the rule of that decision, but we have grave doubts whether such a rule is either necessary or desirable. "Such a measure may of course be abused by the unscrupulous. Therefore, its allowance should be left to the trial judge's discretion." Wigmore, op. cit. p. 395. The rights of the defendant will be fully protected if the power to compel production of evidence in possession of the state is committed to the sound discretion of the trial judge, subject to a review by this court for abuse. There should be no great difficulty in determining, after the record has been fully made up, whether a defendant has *in fact* been deprived of his right to a fair and impartial trial by denial of the motion.

It requires no undue strain upon the meaning of language to hold that § 26-932, O. C. L. A., providing "The law of evidence in civil actions is also the law of evidence in criminal actions and proceedings * * *", is broad enough to include the authority vested in the court by § 10-401, O. C. L. A., to order a party to produce evidence in his possession before the trial. We approve the dictum of the Yee Guck case and hold that the Circuit Court in the instant case had discretionary power to grant the defendant's motion for permission to inspect the confession.

■ The inquiry, then, is whether the denial of the application amounted to an abuse of discretion. The written motion itself sets forth no grounds for its allowance. The grounds specified by defendant's coun-

sel, upon the oral application made just before the commencement of the trial, are, first, "in order to determine whether or not the statement made by the defendant is a rational statement, or an accurate statement, of the facts as he has related them to me", and, second, "I intend to attack the validity of the confession as regards the formalities of taking it." Counsel added: "He (the defendant) doesn't know what he said, and I think it is only fair that I be apprised of what it says and be given an opportunity to examine the same before the trial gets under way." During the trial, when the matter was again referred to in connection with a motion by the defendant to exclude the confession from evidence, Mr. Ryan, of counsel for the defendant, informed the court that if they had had available a copy of the confession "perhaps my opening statement would have been different, and the matter of my conduct of this case would have been different," and laid emphasis on the point that Captain Browne had testified on the preliminary inquiry relative to the voluntary character of the confession, that he had told the prisoner before it was made that it "could be used for or against him". At one point in the confession the following appears:

"Q. Well, when you killed her, what made you make your decision that you should kill her?
"A. It just come to me (snapping fingers), just the second she started screaming."

Referring to this answer, it is argued that Dr. Dixon's testimony would have been much more effective "had this typically diseased behavior of the defendant been discussed and analyzed by him before his testimony".

After careful consideration of all these matters and the entire record of the case, we have reached the conclusion that this assignment of error cannot be sustained. Not only did two days elapse after the confession was produced in court before Dr. Dixon testified, but three more days elapsed before the defendant finally rested his case. If additional time was needed by Dr. Dixon to consider the confession or any particular portion of it in its relation to the defendant's mental condition, he could have taken it, and defendant's counsel could have recalled him to the witness stand. There is nothing in Dr. Dixon's testimony to indicate that he needed further time for preparation, and it may be assumed that he did not because counsel for defendant did not accept the court's offer to grant a recess for that purpose if it should be requested. The record hardly bears out counsel's unsupported statement that the defendant did not know what he said in the confession. It is not supported by the defendant, for he did not testify. The testimony of Dr. Dixon, who interviewed the defendant before the trial, suggests the contrary. He testified, "I don't feel there is any impairment of memory in this case." Since the defendant's counsel do not advise us in what particular the opening statement or the conduct of the trial would have been different had they been permitted to inspect the confession, we are not required to speculate upon this claim, or to assume some prejudice to the defendant's case that has not been disclosed.

We are somewhat mystified by the argument, based upon the testimony by Captain Browne, that he told the defendant that his confession could be used for or against him. Since this statement does not appear in State's Exhibit 15 inspection of that document would

not have disclosed it. If counsel contend, as they seem to, that the statement amounts to an agreement to make the confession available to defendant before the trial, we think the contention is extreme. If, perchance, there should be anything in the confession that would help the defendant he would have the benefit of it—that is all that we are able to make out of what Captain Browne said to him.

Dr. Dixon testified to his "reaction" to certain statements of the defendant which appear in State's Exhibit 15, including the answer which we have quoted above. He volunteered that the defendant told him "relatively the same story" that is found in State's Exhibit 15. Based upon this interview and such other information as he was able to obtain about the defendant's history, he was of the opinion, to which he testified, that the defendant was an individual who is "unable to plan ahead" or "premeditate". We are not told how he could have improved his knowledge of the case or testified more effectively had he been afforded a pre-trial inspection of the confession, and we are far from convinced that this claim has any basis in fact.

The admissibility of the defendant's various confessions will be discussed later in this opinion, but, since one of the grounds for the motion to inspect was that counsel intended "to attack the validity of the confession as regards the formality of taking it", it should be said at this point that a pre-trial inspection of the confession would not have aided counsel in his attack in the slightest degree.

We are of the opinion that the Circuit Court did not abuse its discretion in denying the motion for an

inspection of State's Exhibit 15 and that no prejudice resulted to the defendant from the ruling.

During the voir dire examination of the jury a prospective juror, Joseph C. Rolison, was questioned by counsel for the defendant as to whether he had any conscientious scruples against capital punishment, and indicated that the answer to the question would depend upon whether or not a sentence of life imprisonment meant that the person would actually be incarcerated for the remainder of his life. The court interrupted with the following statement:

"Well, there are probably six forms of verdict to be submitted to you. Of course, if one is found guilty of murder in the first degree without a recommendation of life imprisonment by a jury, why, then the person is executed. If there is a recommendation by the jury on conviction of first degree, a recommendation by the jury, then the imprisonment would be for life, and that is the law. As a practical matter, how long he would serve I have no idea, nor do you. That would be up to the Board of Probation and Parole very largely. Do you have any—you say with one reservation you don't have any objection or conscientious scruples against the imposition of the death penalty. What is that?"

The examination proceeded, and Mr. Rolison stated that he could not bring in a verdict of death if he knew that "the person was going to be imprisoned for the rest of his life." Later the deputy district attorney examined Mr. Rolison and the following occurred:

"Q. You heard the court explain that it was up to the parole board on a life imprisonment—

"MR. RYAN: If the court please, I object to that. I don't think that has any part in this case, to go into the question of what the parole board is going to do with this boy in the event they find him

guilty. It puts us at a terrible disadvantage, and at this time I ask for a mistrial.

"THE COURT: I will deny the motion. Ordinarily you would be quite right, Mr. Ryan, but the juror has asked for this very information, in effect, by his statement, two or three times, that he would not favor life imprisonment, or would not favor the death penalty provided one could be put away for life; making it necessary that this further explanation be given to him. But if that is a condition under which the juror would sit, I would be inclined to think that he should be excused."

The ruling is assigned as error, the defendant's counsel contending that it was prejudicial to their client's rights to bring before the jury the possibility that the defendant would be paroled if he should be sentenced to life imprisonment. They cite four cases: *Fair v. State,* 168 Ga. 409, 148 S. E. 144; *Berry v. Commonwealth,* 227 Ky. 528, 13 S. W. 2d 521; *State v. Johnson,* 151 La. 625, 92 So. 139; *State v. Blackman,* 108 La. 121, 32 So. 334, 92 Am. St. Rep. 377. These are all cases in which the prosecuting attorney in the argument to the jury sought to secure a verdict of death by statements to the effect that persons sentenced to life imprisonment rarely served out their terms. Typical is *Berry v. Commonwealth* in which the objectionable argument was as follows: "Send him (the defendant) to the penitentiary and in a few years some soft-hearted Governor will pardon him and turn him loose on society to kill somebody else." Again, in *State v. Johnson,* the assistant district attorney told the jury that the law which authorized the jury to fix the sentence, either of capital punishment or life imprisonment, "is a farce, or rather a fiction of the law. It does not mean what it says. It only means that

the defendant would be sentenced to serve his natural lifetime in the penitentiary, and history shows that, after a short period of time, say 5, 10, or 15 years, he would be turned loose again on society." (151 La. 632) In all the cases cited by defendant arguments of this type were held to be prejudicial and ground for reversal.

We are not concerned here with a case of an appeal to the jury to bring in a verdict of death because of the probability that a sentence of life imprisonment actually means imprisonment for only a few years, but with a case in which the court, responding to the apparent difficulty a prospective juror was having with the question, undertook to explain it. The present case is much more like *Postell v. Commonwealth,* 174 Ky. 272, 192 S. W. 39, and *Lawler v. Commonwealth,* 182 Ky. 185, 206 S. W. 306, than the decisions on which the defendant relies. In the Postell case it appears that, after the jury had commenced to deliberate upon its verdict, it came into the courtroom and asked the court if a prisoner under a life sentence was subject at any time to a parole from the Board of Prison Commissioners. The court gave an affirmative answer, and the jury retired and afterward returned the death verdict. The court said:

" * * * This, if it occurred, was error, because the jury's verdict should not be influenced by what another department of the state government might or might not do, or had authority to do. It is to be guided only by the facts pertaining to the guilt or innocence of the accused, and the law applicable thereto. But, as this is not shown by the bill of exceptions, we do not reverse the case because of it, mentioning it only for the guidance of the trial and other courts in the future."

We note in passing that the statement in *Berry v. Commonwealth*, supra, 227 Ky. 528, 550, that the judgment in the Postell case was reversed because of this action of the trial judge, is erroneous. The judgment was reversed, but on other grounds. In *Lawler v. Commonwealth* the misconduct complained of was a statement made by the prosecuting attorney on the voir dire examination of a prospective juror "that one convicted of a life sentence was under the law subject to be paroled after eight years' service in prison." As to this the court said:

" * * * Whether this was calculated to influence the juror for or against the defendant is problematical. A humane juror might be induced thereby to give the lighter penalty, while another less humane might thereby be induced to impose the heavier one. At any rate we think the question was improper, and the court should not have permitted it to be asked. We do not, however, regard it so prejudicial as was the imparting of similar information to the jury by the judge of the court, as shown in the case of Postell v. Commonwealth, 174 Ky. 272. In that case the jury had heard all the evidence and had deliberated on the case. The circumstances under which they were informed as to the parole law indicated that they were about to arrive at a verdict and such information was calculated to influence them. When the question was asked the juror in the instant case no evidence had been heard, and neither the degree of the offense nor the defendant's connection with it had been placed before the jury. We are of the opinion, however, that under the interpretation given to sec. 281 of the Criminal Code this alleged error can not be considered by us."

Our statute, § 23-411, O. C. L. A., provides:

"Every person convicted of murder in the first degree shall be punished with death, except when

the trial jury shall, in its verdict, recommend life imprisonment, in which case the penalty shall be life imprisonment * * *.''

■ In fixing the penalty in a first degree murder case, the jury's choice is between capital punishment and a sentence of life imprisonment. The possibility of pardon or parole, purely speculative, should not enter into the jury's deliberations, and was irrelevant on the voir dire examination. We, therefore, agree with counsel for the defendant that it was improper for the court to make the statement that it did in this regard, and also improper for the assistant district attorney afterwards to call attention to the court's statement. We are not convinced, however, that the incident resulted in any prejudice to the defendant. We agree with the observations of the Kentucky court in *Lawler v. Commonwealth* about the very similar occurrence in that case. It should be remembered that the statements complained of were made while the jury was being selected and some eleven days before the case was finally submitted. In the instructions the court told the jury that if it brought in a verdict of murder in the first degree, with a recommendation of life imprisonment, ''this recommendation is mandatory and imposes compulsory action on the court. In such event the penalty is imprisonment for life, and you shall assume life imprisonment means imprisonment for life.'' This was the last word that the jury heard upon the question from the court. The assignment of error cannot be sustained.

■■ The appellant assigns as error the action of the court in excusing three jurors because they had conscientious scruples against capital punishment. It is doubtful whether the alleged error is properly before

us, but we have nevertheless examined the contention of counsel, which is to the following effect: In 1914 capital punishment in this state was abolished by constitutional amendment. See General Laws of Oregon 1915, p. 12. In 1920 capital punishment was reinstated as the punishment for murder in the first degree, the jury being given the power to recommend life imprisonment. Const., Art. I, § 37; § 23-411, O. C. L. A.

Section 26-917 (6), O. C. L. A., provides that a cause for which a challenge for implied bias may be taken is the following: "If the offense be punishable with death, the entertaining of such conscientious opinions as would preclude a person from finding the defendant guilty; in which case he shall neither be permitted nor compelled to serve as a juror." This statute has remained unchanged since its enactment in 1864. It is not claimed that it was repealed by the constitutional provision abolishing capital punishment. It is contended, however, that since, at the time the statute was enacted, the death penalty on conviction of first degree murder was mandatory, "conscientious scruples against capital punishment would affect the enforcement of the law"; but, as we understand it, that this is not true under the present legislation authorizing the jury to recommend life imprisonment (§ 23-411, O. C. L. A.), and therefore Subd. 6 of § 26-917 has been repealed by § 23-411. Alternatively, it is argued that, if the repeal has not been effected, then § 26-917 is unconstitutional because it violates the provision of Art. I, § 11, of the State Constitution that "In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury". The defendant's brief says: "The effect of the provision automatically excusing persons who are opposed to capital punish-

ment means that the jury will be composed of persons whose attitude is more harsh and who are more prone to be vindictive in the enforcement of laws and the punishment of crime.''

The claim that the section in question has been repealed is answered by the simple statement that there is no conflict between it and the present law providing for capital punishment.

The constitutional point rests upon the false premise that a person who believes in capital punishment, or at least one who has no conscientious scruples against it, is apt to be unfair and vindictive. This is practically an indictment of the people of Oregon, for it is by their will that capital punishment is authorized in this state. The statute on that subject is substantially the same as the constitutional provision. Const., Art. I, § 37. Both reflect the policy of the state that the ends of justice and the protection of the public are subserved in specific instances by putting to death a person convicted of murder in the first degree, the jury being invested with the power to determine whether a particular case calls for the extreme penalty. The Constitution and the statutes assume, as well they may, that a man or a woman may have no conscientious scruples against capital punishment and yet be a fair and impartial juror. The state has rights as well as the defendant; it would be deprived of an important right were it forced, in a case in which its representatives conscientiously believed that it was their duty to demand the death penalty, to accept even a single juror whose convictions upon the subject of capital punishment would prevent him from exercising the discretion committed to the jury by the Constitution and the statute.

During the thirty years that have elapsed since capital punishment was reinstated in Oregon it has been the uniform practice to apply the provision now challenged in first degree murder cases. This practice is not conclusive against the defendant's contention; it does, however, fortify the conclusion that it is without merit. One might just as well argue that capital punishment itself is unconstitutional. This has been done, but to no avail. *State v. Butchek,* 121 Or. 141, 153, 253 P. 367, 254 P. 805.

 Assignments of Error 5, 7 and 9 present similar questions and will be considered together.

By Assignment 5 it is contended that the court erred in admitting over defendant's objections the testimony of Officers Wiles and Mitola as to confessions of the defendant to them. These confessions consisted of the statements made by the defendant shortly after he was brought to the county jail on the early morning of August 11, when he told Officer Wiles that he wanted to talk to a homicide officer about a murder, and proceeded to relate the story of the crime, first in the police station and later on the way to and at the scene of the crime. The ground of the objections was that the officers did not advise the defendant that anything he might say would be used against him, or of his right to counsel, or his right to be taken before a magistrate.

Assignment 7 is based upon the admission in evidence over defendant's objection of State's Exhibit 15, the transcribed confession, and Assignment 9 upon the admission in evidence of State's Exhibit 18, the confession which the defendant wrote in his own hand. In addition to the grounds asserted in support of the objections to the testimony of the officers, it was

claimed at the trial, and is claimed here, that the confession, Exhibit 15, was not voluntary. The objection to Exhibit 18 is that the defendant should have been first taken before a magistrate where he would have been informed of his constitutional rights. §§ 26-1515, 26-1519, 26-1547 and 26-1556, O. C. L. A.

The contention that a voluntary confession made before the accused has been taken before a magistrate is inadmissible in evidence is determined adversely to the defendant on the authority of *State v. Folkes,* 174 Or. 568, 587, 150 P. 2d 17, 323 U. S. 779, 89 L. ed. 622, 65 S. Ct. 189; and the claim that unless the defendant was first advised of his constitutional rights his confession would be inadmissible, conflicts with the law as laid down in *State v. Henderson,* 182 Or. 147, 173, 184 P. 2d 392, and *State v. Butchek,* supra, 121 Or. 153. In this connection it is to be observed that before the defendant made the confession, State's Exhibit 15, Deputy District Attorney Collier advised him as follows:

"That is right. I will explain to you: You do not have to make any statement at all. And if you do make a statement it must be made of your own free-will and voluntarily on your part, without any threats or coercion on the part of anyone. And if you make the statement it can and will be used against you. Now, do you understand what I have said?"

The objections on these grounds are without merit.

Neither is there merit in the contention that the confession, State's Exhibit 15, was not voluntarily made. There is not the slightest suggestion in the evidence that any influence whatever was brought to bear upon the defendant to induce him to make the

statement—not even persuasion. In fact, nothing of this kind is claimed; the position of counsel on the question may be best shown by quoting his objection made on the trial:

"(By MR. RYAN) I move at this time for the exclusion of the confession. First, it is evident from the testimony here adduced, and the testimony of Officer Mitola, that the defendant had been awake since the early morning on the 11th and was still awake at 2:00 o'clock when he came in to the jail. And instead of being given an opportunity to sleep he was—the questioning continued until approximately 7:00 o'clock, at which time he was ready, because of his fatigue and highly nervous state, and because of other factors, which indicate his mental incapacity, to make this statement. There was—the reason for the speed and hurry on this, in my opinion—and I think it is a fact—was that they wanted to have him make a statement while he was in the mood and before he had an opportunity to get counsel or to appear before a magistrate for a hearing, at which time, upon reflection or upon advice, he would be aware of his rights not to make a statement. I move on that ground. I have some other grounds."

All this is urged in the face of the fact that the defendant had theretofore, without prompting or suggestion from anyone, entirely on his own motion, told the officers about his commission of a murder of which they had never heard up to that time (as in *State v. Butchek,* supra), and of the further fact that on the evening of the same day he asked for paper and pen so that he could write out another confession. It is, of course, entirely possible that the defendant's "mental incapacity" had something to do with his apparent eagerness to confess, not once but several times; on the other hand, it may have been due to those

gnawings of conscience which sometimes impel even the most depraved of human beings to divulge their crimes. This is the view that the jury, which ultimately passed on the question of the voluntary character of the confessions, had a right to take.

Assignments of Error 5, 7 and 9 are devoid of merit.

Assignments of Error 6, 8, 10, 15 and 17 present a common objection, to-wit: The gruesome character of certain exhibits admitted in evidence. These were the clothing worn by the murdered girl, a billfold and its contents taken from the pocket of the "levis" she wore at the time that she was killed, and a photograph of the girl's body taken in the morgue after her clothes had been removed.

The defendant's plea of not guilty put in issue every material allegation of the indictment, including not only the fact of the killing of Thelma Taylor by the defendant, but that it was done "unlawfully and feloniously, purposely and of deliberate and premeditated malice". The state had the burden of proving all the elements of the crime to the satisfaction of the jury beyond a reasonable doubt if it was to establish the charge of first degree murder. To this end evidence corroborating the defendant's confessions was essential. § 26-939, O. C. L. A. The wounds inflicted upon the dead girl shown in the photograph, and the holes in the jacket, blouse and brassiere which she had worn, evidently made by a knife blade, tended to show that the crime was committed in the manner described in the confessions, and these exhibits were also relevant upon the question of deliberation and premeditation. *State v. Butchek,* supra, 121 Or. 155 et seq. Two identification cards found in the billfold tended to prove that the body found by the officers was the body of

Thelma Taylor. The "levis" of blue denim further tended to corroborate the statement by the defendant in the confession, State's Exhibit 15, that the girl was wearing a garment of that description. The fact that these items of evidence were cumulative, that possibly the case could have been sufficiently proved without them, is not controlling. Nor was the state bound to content itself with admissions made on the trial by defendant's counsel for the purpose of keeping out this damaging evidence. As long as the defendant's plea of not guilty stood, the state had the right to prove its case up to the hilt and to choose its own way of doing so (*State v. Grieco*, 184 Or. 253, 259, 195 P. 2d 183; *State v. Young*, 52 Or. 227, 230, 96 P. 1067, 132 Am. St. Rep. 689, 18 L. R. A. (n. s.) 688), subject only to the rules of evidence and the standard of fair play which should govern the prosecution of every criminal case. There is no rule which requires the district attorney to be mealy-mouthed or to withhold material evidence, either because it is offensive to the defendant or his counsel or shocking to the sensibilities of jurors. This is a shocking case. As counsel for defendant said in his opening statement to the jury, "the evidence is going to be of a gruesome detail." How it could be otherwise in a case of this kind we do not know. Some of the exhibits in question, particularly the photograph of the corpse, are indeed gruesome, but they were all relevant and, therefore, properly received in evidence. Our decisions fully support this conclusion. *State v. Garver*, 190 Or. 291, 225 P. 2d 771; *State v. Grieco*, supra; *State v. Henderson*, supra, and Oregon cases there cited. These assignments of error are without merit.

▮ In connection with the assignments of error just

disposed of we may discuss the defendant's contention that the court erred in permitting Dr. Vinton D. Sneeden to testify, over the objection of defendant's counsel, in unnecessary detail concerning the cause of death of Thelma Taylor. Dr. Sneeden performed the autopsy and was examined about his findings. He identified the photograph of the corpse which was received in evidence, and testified that the picture would aid him in explaining his findings to the jury. He was permitted to use the picture for that purpose, and did testify in considerable detail as to the numerous wounds that had been inflicted upon the head and body of Thelma Taylor, and gave his opinion as to their effect. The argument in support of the assignment of error is, in substance, the same as that which is urged against the admission in evidence against the photograph, that is to say, that it would incite the jury to hostility against the defendant. It was the duty of the state to prove the cause of death as alleged in the indictment. Dr. Sneeden was a competent witness for that purpose. His testimony was of a technical character, and it was a matter of discretion with the trial judge to determine the extent of the detail which would be permitted the witness. We find no abuse of such discretion, and, for the reasons given in overruling the assignments of error regarding the admission of the alleged gruesome exhibits, this assignment of error is likewise found to be without merit.

█ Upon cross-examination of Dr. Dixon the witness was permitted, over the objection of counsel for the defendant, to answer questions as to whether the defendant was legally sane, that is, whether he knew the difference between right and wrong. Dr. Dixon testified in substance that the defendant did know the

difference between right and wrong. The ground of the objection was that this testimony invaded the province of the jury, and the objection is reiterated here, notwithstanding the fact that counsel for the defendant, on the direct examination of Dr. Dixon, elicited testimony from him favorable to the defendant which was equally open to this objection, assuming that it has any merit. The point, however, has been settled adversely to the defendant's contention in *State v. Roselair*, 57 Or. 8, 109 P. 865, in which, after careful consideration, this court held that testimony by an expert, identical to that given by Dr. Dixon, was properly received. The same argument that the defendant makes here was made there and rejected. The doctrine of that decision is the settled law of this state. See, also, 32 C. J. S., Evidence, § 520.

Another assignment of error is based upon a similar ruling with respect to the testimony of Dr. Benjamin F. Williams, a psychiatrist called by the state. It is disposed of by what we have just said.

On the cross-examination of Dr. John W. Evans, a psychiatrist called by the state, counsel for the defendant questioned the witness concerning the conduct of psychopaths, evidently for the purpose of attempting to show that the defendant, who concededly had "a psychopathic personality", was unable to form a plan and carry it out, or, in other words, to premeditate. The following is a part of the cross-examination:

"Q. Well, isn't it true that this type of person is generally a creature of the moment?

"A. Yes, yes.

"Q. And, unlike other persons, if panic once overtakes them, they are going to act on it much more easily than a normal person?

"A. That is true, very true.

"Q. And in a moment of panic, of impulse, and having, as Dr. Dixon used the term, the stimulus, having once had the stimulus for their course of action and become excited by it, then they don't act on reflection?

"A. That is true.

"Q. And if this girl started screaming and he said 'It came to me like that,' is that generally the way they make decisions?

"A. That is right; under the stress of strong stimuli, you see.

"Q. And that would be consistent, entirely consistent, with the psychopath's behavior?

"A. Yes, yes."

The question, "And if this girl started screaming and he said 'It came to me like that' ", had reference to a statement made by the defendant in his confession in answer to the question, "what made you make your decision that you should kill her?" As disclosed by State's Exhibit 15, the defendant answered: "It just come to me (snapping fingers), just the second she started screaming." Prior to giving this answer the defendant had described the murder in great detail. Among other things, he said that a freight train came by the place where he and the girl were, that the train-men were switching cars, and the girl started to scream, and screamed loud enough for the men to hear her, whereupon he struck her on the head with the steel bar and continued to strike her until she quit screaming, and then "knocked her out" by hitting her across the forehead and then "stabbed her once or twice".

On redirect examination the district attorney propounded to the witness a long hypothetical question based entirely on State's Exhibit 15, which concluded as follows: "Now, taking those things into consider-

ation, would you say that he had acted impulsively and on the spur of the moment, or would you say that the passing of the train put into execution an already made plan?" Counsel for the defendant interposed an objection that portions of the question were inconsistent with the record and that the question did not include all the statements in the confession. He pointed to a number of facts which he claimed should have been included. He further objected on the ground that the answer called for by the question would invade the province of the jury, an objection which need not be further noticed. The court overruled the objection, and the witness answered to the effect that "the man certainly had the ability to control himself." The ruling is assigned as error.

The hypothetical question was a fair resume of the confession. It did not, it is true, include everything which the defendant said, but everything in it was based upon what the defendant did say. And, since some parts of the confession were, or might be found by the jury to be, inconsistent with others, or with other evidence in the record, counsel's demand was a highly unreasonable one. For example, he insisted that the question should assume the truth of a statement of the defendant which appears in State's Exhibit 15 that "the reason I killed her was because she started screaming, I had no intention of killing her originally." This might be found to be inconsistent with what the defendant wrote in the confession, State's Exhibit 18, "on the same said Friday I picked up a piece of steel 18 in long ½ in round with the idea of killing her with it."

The rule respecting the contents of a hypothetical question, as laid down by this court, is as follows: "If

plaintiff asks a fair question based on substantial evidence he may have the expert's opinion on any combination of facts he may choose. He need not include in the question all the details which appear in his own case and certainly cannot include the contradictory matter in his opponent's case. He may lay before the jury by hypothetical questions scientific inferences properly deducible from the facts supported by his evidence. The form of such questions is generally within the discretion of the trial court'' (citing numerous Oregon decisions). *Carruthers v. Phillips,* 169 Or. 636, 645, 131 P. 2d 193.

Judged by the standard thus fixed, the question objected to was a fair question, and the objection was properly overruled.

■ During the cross-examination of Dr. Williams, counsel for the defendant quoted from the writing of a number of recognized authorities on diseases of the mind. On re-direct examination the district attorney asked:

> "Doctor, after hearing all these texts counsel has read and your discussion with him, is there anything that has been read or said that is in conflict with your original opinion that Morris Leland has the ability to distinguish between right and wrong, and premeditate and deliberate?''

Counsel for the defendant objected on the grounds that the question called for the conclusion of the witness and was not a proper hypothetical question because it did not include all the facts of the case. The court overruled the objection, and the witness answered in the negative. The question was not in fact hypothetical because it did not assume the truth of anything, but was merely an inquiry as to whether the doctor's opinion, expressed on direct examination, that

the defendant was able to distinguish between right and wrong, and able to premeditate and deliberate, was in conflict with anything "read or said" during the cross-examination. The question was objectionable, however, because not even an expert would be the judge of whether such conflict existed. That was exclusively for the jury. We think that the district attorney intended to ask whether anything brought out on the cross-examination had caused the witness to change his opinion, and that the witness probably so understood the question. Whether this be so or not, the ruling, in our opinion, did not constitute reversible error.

■ Upon the conclusion of the taking of testimony and before the closing arguments began, counsel for the defendant requested the court to instruct the jury "that they are not to permit this gruesomeness of this evidence to be allowed—their passion to be aroused by the District Attorney's comment." The court said:

"When the jurors were being interrogated on voir dire they were told to disregard passion, prejudice and sympathy, and I shall repeat that in my instructions to them. Otherwise, I will deny the motion."

The ruling is assigned as error. It was entirely discretionary with the court to determine whether such an instruction should be given at that time. It appears that during the testimony of Dr. Sneeden the court interrupted to instruct the jury at some length, with particular reference to the photograph of the corpse, against allowing their judgment to be controlled by sympathy, passion or prejudice. Similar instructions were given in the charge at the close of the case. These admonitions, we think, sufficed. The court is not required to caution the jury to do their duty and to warn

them against improper influences every time counsel makes such a demand.

It is claimed that the court erred in failing to grant the motion of defendant's counsel to withdraw from the consideration of the jury the questions of first degree murder on the ground that there was no proof beyond a reasonable doubt of deliberation and premeditation and malice. In support of this assignment of error counsel point to certain portions of the testimony of the psychiatrists regarding the defendant's mental condition. But, besides the fact that the experts disagreed among themselves, the jury were not bound by their opinions. *In re Faling Will,* 105 Or. 365, 449, 208 P. 715; 32 C. J. S., Evidence, 402, § 569 h. It was the province of the jury to determine the questions of premeditation and deliberation and malice from all the evidence in the case, some of which was decidedly in conflict with the expert testimony to the effect that the defendant was incapable of premeditating. It has been held by this court that premeditation and deliberation are always questions for the jury. *State v. Butchek,* supra, 121 Or. 159.

Assignment of Error No. 20 leaves something to be desired as a compliance with the rules of this court respecting the preparation of briefs. It includes alleged errors in the court's failure to give twenty-six requested instructions and in giving some four printed pages of instructions. The exception to the instructions given, which relate to the defense of insanity, is not set forth in the brief as the rules require. The transcript, however, shows that the sole exception taken to the instructions was the following:

"MR. RYAN: I have one exception; I want it to show on the record in this case that we except

to the instruction that insanity must be proven beyond a reasonable doubt, on the ground and for the reason that it deprives the defendant of due process of law under the United States Constitution.''

The instructions upon the subject of insanity are substantially the same as those which we approved in *State v. Garver,* supra, following earlier precedents in this state. We are now once again asked to hold unconstitutional the Oregon statute, § 26-929, O. C. L. A., which casts upon the defendant the burden of proving the defense of insanity beyond a reasonable doubt, and to overrule the recent decision in *State v. Grieco,* supra, which rejected that contention. We are also again urged to abandon the so-called ''right or wrong'' test of insanity and adopt the rule of ''irresistible impulse''. In *State v. Garver* we re-examined that question and reached the conclusion that, even though we thought it desirable, we could not, in the face of § 23-122, O. C. L. A., abandon the rule of our decisions, that insanity as a defense to crime is a disease of the mind which renders the person incapable of understanding the nature, quality and consequences of his act, or of distinguishing between right and wrong in relation to such act. Nothing has been presented in this case upon this question not heretofore considered by us in the Garver case. We adhere to that decision. We have heretofore recognized the harshness of the legislation with regard to the burden of proof of insanity. *State v. Garver,* supra. But we are not convinced that the legislature could not constitutionally so provide, and feel bound to reaffirm the holding of the Grieco case that § 26-929, O. C. L. A., does not offend against any constitutional guaranty. We find the instructions on insanity free from error, and particularly that the

court was right in refusing to submit to the jury the question of "irresistible impulse" as the test of legal insanity.

■ We do not consider that we are under a duty to discuss separately all the numerous requested instructions brought together under this assignment of error. Apart from those having to do with the defense of insanity, various of the requests are grouped under headings, as follows: "impulsive acts of defendant", "premeditation and deliberation", "willfulness", "abandonment of intention", and "miscellaneous". The charge of the court covered completely and carefully all phases of the law of homicide applicable under the evidence. Many of these requested instructions deal with deliberation and premeditation. The court instructed at length on these subjects, and, as no exceptions, other than as already noted, were taken to the instructions, and no criticism of any of them is made in the defendant's brief, we take it that counsel for defendant concede their correctness. Yet, without any argument to support the position, we are asked to hold that the court should have given instructions on these subjects in the language of counsel instead of the language actually chosen. A comparison of all the requested instructions with the charge of the court justifies the conclusion that the substance of all the requests which correctly state the law was given in the court's charge, and hence there was no error in declining to adopt these requested instructions.

■ As to the remaining requests, the only ones which, in our opinion, call for particular mention are the following:

By two requested instructions, which fall under the heading in the brief "abandonment of intention",

counsel for defendant would have had the court instruct the jury in effect that, if they found that the defendant deliberated and premeditated and planned, and then abandoned the plan and later, not in pursuance of the plan or deliberation or premeditation but acting hastily upon the moment, killed the deceased, then he would not be guilty of murder in the first degree. In support of the claim of error, counsel cite 15 Am. Jur., Criminal Law, 22 § 328; *United States v. Britton,* 108 U. S. 199, 27 L. ed. 698, 2 S. Ct. 531; *State v. Webb,* 216 Mo. 378, 115 S. W. 998, 129 Am. St. Rep. 518, 20 L. R. A. (n. s.) 1142. The rule of these authorities is stated in American Jurisprudence as follows: "There is in every design or plan to commit a crime a place of repentance or locus penitentiae whereby the one planning to commit it may abandon the idea and thus avoid criminal liability." The text further says: "It is obvious, however, that where the crime is consummated, there is no field for an application of the doctrine." The principle was applied in *State v. Webb,* supra, which holds that, where the defendant and another entered into a suicide pact, it was a good defense to show that the defendant abandoned his purpose of committing suicide and also endeavored to persuade the other party to the pact, who killed herself, to abandon it. The requested instructions were properly refused because the rule they involve has no application whatever to this case. Here the crime was consummated. The defendant killed the girl. If he did so willfully and purposely, with premeditation, deliberation, and malice, he was guilty of first degree murder; otherwise he was not. The court instructed the jury:

"If the mind fully and calmly forms a design to kill *and the act is committed pursuant to such*

*design,* then it is premeditated, no matter how short or how long an interval of time may elapse before such design is executed." (Italics added.)

"In order to find the defendant guilty of murder in the first degree, you must find that he killed the deceased *as the result of a deliberate and premeditated act, in pursuance of a design formed and matured by him* when he was the master of his own understanding, and after he had had the time and opportunity for deliberate thought." (Italics added.)

" * * * It is necessary that the deliberation and premeditation result in a complete and specific intention to commit an act and it must be formed in the defendant's mind *so that he acts upon it.*" (Italics added.)

Thus, the court plainly told the jury that, before they could find that the crime was premeditated, they must find that it was committed pursuant to a design previously formed. The jury could not, under these instructions, find the defendant guilty of first degree murder if they believed that he had, at the time of the killing, abandoned such a design.

■ Another of such requested instructions is the following: "I instruct you that if you believe the defendant killed the decedent in the manner stated in the confession, to wit: 'It just come to me (snapping fingers), just the second she started screaming,' then you cannot find the defendant guilty of murder in the first degree." We have already recounted the circumstances of the crime to which the quoted statement of the defendant relates. No authority has been cited for the propriety of such an instruction, and we are confident that none can be found. For the court to have given it would have been a gross usurpation of the

jury's function to determine the effect of the evidence and the questions of deliberation and premeditation.

Assignment of Error No. 20 and all its numerous parts are without merit.

■ The following occurred during the argument of the deputy district attorney:

"MR. CARSKADON: Now, Ladies and Gentlemen, when you are in the jury room, remember the State's silent witness in this case, Thelma Taylor. She is here. Her picture is making the argument to you on the grounds of malice—

"MR. RYAN: (interrupting) If the court please, I object to that.

"THE COURT: I will sustain the objection to the form of the argument."

This was followed by a motion for a mistrial, which the court denied in the following language:

"Let the record show the court feels the immediate occasion for the motion for mistrial was the District Attorney's reference to 'the silent witness.' Objection was immediately made by counsel for the defense and the objection was sustained. Counsel has been instructed to no longer pursue that type of argument. The motion will be denied."

The argument was not particularly inflammatory, but it might have become so had it continued along the same lines, and we think the court did well to put a prompt stop to it. The ruling had the effect of forestalling any prejudice that might otherwise have resulted. There was no abuse of discretion in denying the motion for a mistrial.

The judgment is affirmed.