FLYNN, J.
**366 A jury sentenced defendant to death after convicting him of aggravated murder, kidnapping, and other crimes against Celestino Gutierrez, as well as multiple offenses arising out of two bank robberies. In this automatic and direct review of his convictions and sentence of death,[1] defendant primarily *335 raises arguments that are contrary to controlling precedent without offering persuasive reasons to depart from that precedent, or arguments that otherwise lack merit. However, some of defendant's assignments of error raise significant issues that this court has yet to expressly address, including: whether the state must expressly allege its theory for joining multiple offenses, whether the governor's moratorium on imposing the death penalty affects the jury's ability to constitutionally consider that punishment, and whether this court should presume that the undisclosed bias of an alternate juror impaired defendant's constitutional right to trial by an impartial jury. We write to address those assignments of error as well as several other significant challenges that defendant raises to the trial court's rulings. Ultimately, having fully considered all of defendant's arguments, we conclude that none of defendant's assignments of error identifies a basis for reversing the judgment, and we affirm.
I. THE CRIMES
The crimes at issue in this appeal include the robbery of a Siuslaw Bank branch in Creswell, Oregon; the robbery of a Siuslaw Bank branch in Mapleton, Oregon, two months later; and the kidnapping and murder of a young man in order to steal his car to use in committing the Mapleton bank robbery. In addition to defendant, the participants in these crimes were Toni Baker (defendant's friend), Mercedes (Sadie) Crabtree (Baker's 18-year-old niece), A.J. Nelson (Crabtree's longtime friend), and Wretha Breckenridge (defendant's girlfriend). Both Breckenridge and Crabtree testified in detail about the crimes at **367 defendant's trial-Breckenridge after being given immunity and Crabtree as a condition of her agreement to plead guilty to several offenses, including murder. The facts described below are supported by the testimony of those two witnesses, as well as by other key evidence at trial.
A. The June 8 Creswell Bank Robbery
Defendant and Breckenridge, who both lived in Eugene, decided to rob a Siuslaw Bank branch in Creswell, a small town in Lane County. Defendant enlisted Baker and Crabtree to help with the robbery, and the four met at defendant's home in Eugene to discuss the robbery plan. The plan involved defendant using a bicycle to ride up to and away from the bank while Crabtree waited nearby in a get-away vehicle. Defendant planned to use a bicycle that he had spray painted and stored in Breckenridge's garage.
1. The robbery
On the morning of June 8, according to the plan, Crabtree drove defendant and the bicycle to an alley near the bank. Crabtree drove a red Dodge Caravan registered to Breckenridge's mother and waited in the van while defendant rode the bicycle to the bank to commit the robbery.
Defendant carried two guns into the bank-one a small, pink revolver that belonged to Breckenridge, and the other a larger "western style" .44 magnum revolver with a wood grip. He ordered bank employees and customers to get down on the ground. Several of the employees in the bank activated alarms, which triggered an audio recording, and surveillance video also recorded the robbery. Defendant pointed a gun at the bank employees and ordered them to give him the money from their tills. He also demanded their wallets and purses. Defendant ordered everyone in the bank to remain on the ground while he fled on the bicycle with the stolen money. When he reached the alley where Crabtree was waiting, defendant abandoned the bicycle and rode away with Crabtree in the van.
2. The investigation
Lane County law enforcement officers identified a red Caravan as likely involved in the robbery, and they **368 publicized that information. They began coordinating with an FBI bank robbery task force, which eventually connected defendant to the Creswell bank robbery, to Breckenridge, to the red *336 Caravan registered to Breckenridge's mother, and to a silver Dodge Intrepid registered to Breckenridge. The task force used that information to obtain a warrant to place GPS tracking devices on both vehicles in late July, and the devices allowed officers to track the movements of those vehicles during the series of crimes that followed.
B. The August 3 Crimes
Shortly after the Creswell robbery, defendant broke both of his heels and was incapacitated until late July. When defendant was finally able to walk without crutches, he and Breckenridge drove around in Breckenridge's Intrepid looking for another bank to rob. This time they settled on a Siuslaw Bank branch located in Mapleton, Oregon, another town in Lane County. But two challenges required defendant to form a different plan for this robbery. First, defendant's injuries left him unable to ride a bike and in need of assistance inside the bank. Second, defendant knew that law enforcement officers had publicized a red Caravan's link to the Creswell robbery, so defendant did not want to use the Caravan.
1. Planning the Mapleton robbery
Defendant again recruited Crabtree to help with the bank robbery and arranged for her to bring from Portland an older Toyota that he wanted to use for the robbery. Crabtree also brought her friend, Nelson, to assist defendant inside the bank. The plan for the Mapleton robbery was for defendant and Nelson to drive the Toyota to the bank and then abandon it after the robbery at a location where Crabtree would pick them up in the Intrepid.
On the day planned for the robbery, however, the Toyota broke down on the way to the bank, and defendant abandoned it. He then decided to steal a car and kill the owner so that the owner could not report the theft before defendant had the opportunity to use the car for the robbery. Defendant told Nelson and Crabtree to wait outside a bar **369 near his house and watch for a single man to emerge. He explained that Nelson should stage a fight with Crabtree and then drive away alone. Defendant directed Crabtree to then approach the man and ask for a ride home, to lure him to defendant's house.
2. The kidnapping and murder[2]
As directed, Nelson and Crabtree waited outside of the bar to carry out defendant's plan. Around midnight, Gutierrez left the bar alone. Crabtree and Nelson staged their fight, Crabtree convinced Gutierrez to give her a ride, and she directed him to defendant's house. Gutierrez went inside the house to use the bathroom and, when he emerged, defendant and Nelson were waiting for him. Defendant was carrying an assault-type rifle and ordered Gutierrez to get to his knees. Defendant directed Nelson to bind Gutierrez's feet and arms and then directed him to stab and choke Gutierrez. Nelson did so, but Gutierrez remained conscious. Eventually, defendant used a chain to strangle Gutierrez until he died.
3. The Mapleton bank robbery
Several hours later, at about 7:00 a.m., defendant drove to Breckenridge's house and told her that they had killed someone and gotten a car, and that she should wait for him to return with the others. Defendant, Crabtree, and Nelson then carried out the Mapleton bank robbery according to their original plan but using Gutierrez's car in place of the abandoned Toyota.
Defendant and Nelson drove to the Mapleton bank in Gutierrez's car. When they entered the bank, defendant was carrying a long revolver with a wood grip-the .44 magnum-and Nelson was carrying the assault-type rifle. They yelled for the employees to get on the ground, threatened to kill anyone who did not comply, and demanded the employees' wallets. After taking money from the tills, they **370 ordered everyone in the bank to remain on the ground and fled. As would later prove significant, Nelson dropped a bullet, *337 which a teller noticed and collected for police, and some of the money that the tellers handed over included "bait bills"-bills that had been photocopied and had their serial numbers recorded.
Defendant and Nelson drove from the bank to a location at which Crabtree had arranged to meet them with the Intrepid. Defendant moved the robbery proceeds into the Intrepid and abandoned Gutierrez's car. The three then drove to Breckenridge's house in the Intrepid, where they divided the money, before returning to defendant's house to dispose of the murder evidence.
C. The Investigation Ties Defendant to the Crimes
Five days later, law enforcement officers arrested defendant on a warrant for an unrelated crime. At the time of his arrest, defendant was carrying the .44 magnum wood-grip revolver that he had used in both bank robberies. Because defendant had become a primary suspect in the Mapleton robbery and the murder by that time, he was questioned about those crimes.
Shortly after defendant's arrest, a detective also questioned Breckenridge at her home. Breckenridge provided information about both bank robberies, as well as information about Gutierrez's murder. In a search of Breckenridge's home, officers found the pink handgun that defendant had used in the Creswell robbery. They also found a wallet with defendant's identification and an envelope containing three bundles of cash, including a $ 20 bill that was a "bait bill" from the Mapleton bank robbery.
Searches of locations associated with Baker, Crabtree, and Nelson turned up the assault rifle that defendant had used during the murder and a backpack containing other weapons used during that crime. Forensic examination showed that the unfired bullet collected at the Mapleton robbery had been cycled through the assault rifle and that a filet knife had DNA traces consistent with Gutierrez's profile. In addition, Gutierrez's DNA was found at locations inside defendant's house.
**371 II. PROCEDURAL BACKGROUND
The state charged defendant in a single indictment with 10 counts relating to the Creswell bank robbery, seven counts relating to the kidnapping and death of Gutierrez, 12 counts relating to the Mapleton bank robbery, and two counts of felon in possession of a firearm-one for the date of the Creswell robbery and one for the date of the other crimes. The trial began with a guilt phase, during which the state presented evidence of the crimes described above to a panel of 12 jurors and several alternate jurors. The jury found defendant guilty of all the offenses charged, except that, on one of the four aggravated murder counts, the jury found defendant guilty of the lesser-included crime of intentional murder.
The same jury heard evidence during the three days of the penalty phase. At the end of the penalty phase, the jury unanimously answered "yes" to the statutory questions that determine whether the trial court will impose a death sentence, and the trial court entered a judgment imposing that sentence. See ORS 163.150 (describing sentencing process for a defendant found to be guilty of aggravated murder). Among other evidence presented during the penalty phase, the jury learned that defendant had been convicted for abducting and murdering a woman in 1977 and then disposing of her corpse in a rural location; was incarcerated for those crimes until 2004; and then, in 2009, assaulted a woman, choked her, broke one of her ribs, and threatened to kill her. He had been convicted of fourth-degree assault and strangulation based on that incident.
After the jury returned its verdicts on both the guilt and penalty questions, the court held a sentencing hearing and entered the judgment. That judgment is now before this court for automatic and direct review. ORS 138.052.
III. ANALYSIS
On direct review to this court, defendant raises 131 assignments of error. We have reviewed each assignment of error and, as to each, conclude either that the court did not err or that the claimed error does not supply *338 a basis for reversing the judgment. We write to address assignments **372 of error that fall into four categories: (1) pretrial challenges to the indictment; (2) challenges to guilt-phase rulings of the trial; (3) constitutional challenges to penalty-phase rulings; and (4) a challenge to the trial court's post-judgment ruling denying a mistrial. We reject the remaining assignments of error without written discussion because the issues have already been decided adversely to defendant's position or otherwise lack merit and because further discussion of those issues will not benefit the public, the bench, or the bar.
A. Pretrial Challenges to the Indictment[3]
Prior to trial, defendant raised several challenges to the indictment based on the limits that ORS 132.560(1) places on the state's ability to join more than one offense in a single charging instrument. That statute provides:
"(1) A charging instrument must charge but one offense, and in one form only, except that:
"(a) Where the offense may be committed by the use of different means, the charging instrument may allege the means in the alternative.
"(b) Two or more offenses may be charged in the same charging instrument in a separate count for each offense if the offenses charged are alleged to have been committed by the same person or persons and are:
"(A) Of the same or similar character;
**373 "(B) Based on the same act or transaction; or
"(C) Based on two or more acts or transactions connected together or constituting parts of a common scheme or plan."
Defendant contended that the indictment included multiple offenses that were not properly joined and demurred to the indictment on that basis.[4] Alternatively, defendant moved to sever some of the counts, either on the basis of improper joinder or on the basis of substantial prejudice. The trial court refused to grant the demurrer or to sever any counts, and defendant assigns errors to those rulings. We conclude that neither ruling was error.
1. Defendant's challenge to proper joinder
Defendant's first challenge to the indictment implicates the exception in section (1)(b) of ORS 132.560, which this court recently construed in State v. Warren , 364 Or. 105, 430 P.3d 1036 (2018). Defendant contends, as he did in the trial court, that the indictment improperly joined charges arising out of the June bank robbery incident with charges arising out of the August bank robbery, kidnapping and murder. As this court explained in Warren , there are two requirements for the state to charge multiple offenses in the same indictment: the state's basis for joining the offenses must be "possible, given the offenses and facts alleged," and the state's basis for joining the offenses must *339 be alleged. 364 Or. at 122, 430 P.3d 1036. We conclude that the indictment satisfied both requirements for proper joinder.
In the trial court, defendant argued that the various offenses were not related in a way that makes joinder possible. In response, the state argued that the charges could be joined under ORS 132.560(1)(b)(A) and (C), because the two bank robberies were "of the same or similar character" and because the offenses against Gutierrez were part of a "common scheme or plan" that involved committing the **374 robberies. The trial court agreed. As the court explained in its written order:
"In the case at bar, the state's theory (supported by evidence offered at the hearing on the motion to suppress) is that the murder of Celestino Gutierrez was committed to get a vehicle to use to carry out a bank robbery and that the bank robbery was one of several committed by [defendant]. *** [T]he robberies and the murder are both logically relate[d] and have large areas of overlapping proof."
Under the circumstances of this case, we agree with the trial court that it was possible for the state to join all of the charged offenses. Indeed, on appeal, defendant does not seriously dispute that the offenses are related in ways that make joinder possible under ORS 132.560(1)(b)(A) and (C). The charges related to the Creswell bank robbery could be joined because those offenses were of "similar character"-if not the "same character" as the Mapleton bank robbery charges. Both were robberies of a Siuslaw Bank branch in Lane County and both were committed by defendant. Although there were some differences, in both robberies defendant demanded that the employees turn over wallets and purses in addition to the money in their tills; in both robberies he threatened the tellers with the gun that he was carrying at the time of his arrest; and in both robberies Crabtree served as the get-away driver, allowing defendant to abandon the transportation that he had used to approach the bank. The criminal acts against Gutierrez could be joined because they were part of a "common scheme or plan" to commit the Mapleton bank robbery-to steal a car to use to commit the robbery and to kill the owner so that the theft would not be discovered before the robbery. And finally, the charges of unlawful possession of a firearm could be joined because the firearms that defendant unlawfully possessed were the firearms that he used during each robbery, making his unlawful possession of the firearms part of the "common scheme or plan" to commit the robberies.
We also conclude that the indictment sufficiently alleges the bases for joining the offenses-the second joinder requirement that we identified in Warren . 364 Or. at 122, 430 P.3d 1036. Defendant emphasizes that the indictment does not **375 expressly allege that any of the offenses are "[o]f the same or similar character," "[b]ased on the same act or transaction," or "parts of a common scheme or plan." See ORS 132.560 (1)(b). The state responds, however, that the factual allegations of the indictment sufficiently identify the bases for joinder, and we agree.
This court has held that it is "sufficient for the state to allege the basis for joinder by using the language of the joinder statute." Warren , 364 Or. at 120, 430 P.3d 1036 (citing State v. Huennekens , 245 Or. 150, 154, 420 P.2d 384 (1966) ). But that does not mean that it is necessary for the state to use the language of the joinder statute. As this court explained in Warren , the Court of Appeals has held that an indictment can allege the basis for joinder either " 'in the language of the joinder statute or by alleging facts sufficient to establish compliance with the joinder statute.' " Id. at 109, 430 P.3d 1036 (quoting State v. Poston , 277 Or. App. 137, 145, 370 P.3d 904 (2016) ( Poston I ), adh'd to on recons , 285 Or. App. 750, 399 P.3d 488 ( Poston II ), rev. den. , 361 Or. 886, 403 P.3d 761 (2017) ).
Although we did not expressly approve of that rule in Warren , we do so now. As we have emphasized, the purposes of requiring the state to allege the basis for joinder are to eliminate the need for a defendant "to guess the state's basis for joinder" and to make it possible for the trial court "to determine, from the face of an indictment, whether the indictment complies with the *340 joinder statute[.]" Warren , 364 Or. at 122, 114, 430 P.3d 1036. Both purposes are served when the indictment alleges facts that allow the defendant to understand the state's basis for joining the offenses and allow the court to determine whether that joinder is proper. Indeed, because determining proper joinder ultimately requires the court to look beyond a bare allegation in the words of the joinder statute, alleging the factual basis for joinder may better serve the purposes that this court identified in Warren . See State v. Thompson , 328 Or. 248, 257, 971 P.2d 879 (1999) (whether the facts of a case satisfy the statutory test for joinder is a question of law for the court); State v. Fitzgerald , 267 Or. 266, 273, 516 P.2d 1280 (1973) (although indictment alleged that joined offenses were part of the "same act or transaction," when it later became apparent that the evidence did not support the allegation that charges were part of the **376 same act or transaction, trial court was required to address the improper joinder).
Here, although the indictment did not track the statutory language, it includes factual allegations and cross-references among the charges that are sufficient to establish compliance with the joinder statute. First, the allegations of the indictment connect all of defendant's August crimes to each other as part of a common scheme or plan. The indictment alleges that "on or about August 3" defendant caused the death of Gutierrez "in the course of and in the furtherance of," and "in an effort to conceal the commission of or identity of a perpetrator of," the "crimes of Kidnapping in the First Degree as alleged in Count 12 of this Indictment [kidnapping of Gutierrez] and Robbery in the First Degree as alleged in Count 13 of this Indictment [robbery of Gutierrez.]" It also alleged that defendant caused the death of Gutierrez "in an effort to conceal" the identity of "a perpetrator of the armed robbery of Siuslaw Bank in Mapleton Oregon on August 3, 2012[,] as alleged in Counts 19 through 30 [ ]." The referenced Mapleton robbery counts-counts 19 through 30-allege all of the other robbery offenses that defendant is alleged to have committed in August. Finally, the indictment charges defendant with unlawfully possessing a firearm on the same day that it also alleges he used a firearm to commit the murder and the Mapleton bank robbery. Those allegations permitted both defendant and the trial court to determine that the state had joined the August 3 bank robbery, murder and kidnapping offenses on the basis that the acts were "parts of a common scheme or plan."
In addition, the allegations of the indictment permitted both the defendant and the trial court to determine that the June 8 robbery offenses had been joined with the August 3 robbery offense on the basis of their "similar character." As explained above, the indictment alleges numerous counts of robbery committed "on or about August 3," all of which it identifies as allegations of "the armed robbery of Siuslaw Bank in Mapleton Oregon on August 3." Those counts include allegations that defendant committed the crime of first-degree robbery in Lane County against five different victims,
**377 "while in the course of committing or attempting to commit theft with the intent of compelling [the victim] or another person to deliver the property and engage in conduct which might aid in the commission of the theft and with the intent of preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking and being armed with a deadly weapon a firearm use[d] or threaten[ed] the immediate use of physical force."[5]
The indictment also alleges that defendant committed the offense of second-degree robbery against each victim of the August 3 Lane County bank robbery by "us[ing] or threaten[ing] the immediate use of physical force upon [the victim] and represent[ing] by word or conduct that defendant was armed with what purported to be a deadly weapon."[6]
*341 In nearly identical language, the indictment alleges that defendant also committed first-degree robbery and second-degree robbery against multiple victims on June 8 in Lane County. In other words, the indictment alleges that, on two different dates, defendant committed similar acts, in the same county, with the same intent, and under the same circumstance of, at a minimum, representing that he was armed with a firearm. Thus, the indictment, in effect, alleges that the June 8 and August 3 robbery offenses are "of the same or similar character."[7] Defendant was not entitled to a demurrer on the ground that the state had failed to allege the basis for joinder.
**378 2. Defendant's challenge to joinder based on substantial prejudice
Defendant argued below that, if the charges were properly joined, the court should, nevertheless, sever the charges on the basis of substantial prejudice. On appeal, he assigns error to the trial court's denial of that motion.[8] We conclude that the trial court did not err.
When multiple charges have been properly joined under ORS 132.560(1), either party may move to sever on the basis that the party will be "substantially prejudiced" by a joint trial. ORS 132.560(3). Defendant's theory of substantial prejudice is that the joint trial deprived him "of the protection of" OEC 404(3) (evidence of character not admissible to prove propensity). In other words, the "substantial prejudice" to which defendant points is the admission of evidence that, he contends, would not have been admitted had the charges been tried separately. We review for errors of law the trial court's determination that the joinder will not result in substantial prejudice. State v. Miller, 327 Or. 622, 629, 969 P.2d 1006 (1998).
The trial court rejected defendant's premise that evidence of the August crimes would have been inadmissible in a separate trial of the June, Creswell robbery counts. The court reasoned:
"both bank robberies were conducted in very similar manners, the murder of [Gutierrez] happened in furtherance of the Mapleton bank robbery, and the state alleges Mr. Taylor committed all the crimes. Further, the facts and evidence from the Creswell bank robbery cannot be fully separated from the Mapleton bank robbery because the facts and **379 evidence of both cases are what ultimately led law enforcement to identify Mr. Taylor as a suspect."
Although defendant challenges the court's conclusion that evidence of the August crimes would have been admissible in a trial solely on the June robbery charges, he identifies no prejudice apart from the generic concern that admitting other-acts evidence creates a danger "that the jurors will convict a defendant based, not upon the evidence, but upon their perception of the defendant's bad character," regardless of the court's ability to caution the jury against such a misuse of the evidence. This court rejected essentially *342 the same prejudice argument as too general in State v. Barone , 329 Or. 210, 217, 986 P.2d 5 (1999). There, the defendant argued that it was "obvious" that the joinder of charges for separate murders was "highly inflammatory" and allowed the state to make the defendant look guilty because of other murders, rather than being "required to prove each case on its merits." Id . This court emphasized that "[s]uch general arguments, however, could be made in any case in which charges are joined, and we concluded that "[a]bsent an argument of prejudice related to the specific facts of this case, *** defendant has failed to demonstrate that he was prejudiced within the meaning of ORS 132.560(3)." Id. We reach the same conclusion here.
B. Challenges to Guilt-Phase Rulings
Defendant's 131 assignments of error primarily challenge rulings that affected the guilt phase of his trial, including evidentiary rulings, rulings on jury selection, rulings on jury instructions, and rulings on the sufficiency of evidence of guilt. We write to address two of the issues that those assignments of error raise: defendant's challenge to the court allowing the state to "death qualify" jurors, and defendant's challenge to the court's refusal to give a jury concurrence instruction on the robbery charges.
1. Challenges to "death qualifying" the jury
With respect to jury selection, defendant contends that the trial court violated his constitutional right to an unbiased and impartial jury through a series of rulings that had the effect of "death qualifying" the jury-excluding **380 from participation in the guilt phase of the case jurors who were unwilling to consider imposing the death penalty if the case reached that stage. Although some states have limited the practice, the federal "Constitution does not prohibit the States from 'death qualifying' juries in capital cases." Lockhart v. McCree , 476 U.S. 162, 173, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). This court long ago reached the same conclusion under the Oregon Constitution. State v. Leland , 190 Or. 598, 624-25, 227 P.2d 785 (1951), aff'd sub nom. Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (rejecting argument that Article I, section 11, was violated by former statute, which prevented jurors who would be categorically opposed to imposing the death penalty from participating in the determination of guilt).[9] This court reasoned in Leland that the defendant's challenge to death-qualifying the jury rested "upon the false premise that a person who believes in capital punishment, or at least one who has no conscientious scruples against it, is apt to be unfair and vindictive." Id. at 625, 227 P.2d 785. Although defendant does not ask this court to overturn Leland , and could not ask us to overturn Lockhart , he argues that studies conducted more recently have "confirmed" that "death qualification produces juries uncommonly willing to find guilt, and uncommonly willing to impose the death penalty." However, defendant did not offer those studies in the trial court or otherwise create a record to establish the factual premise of his argument. As presented, we are unwilling to reconsider our precedent on the issue of death-qualified juries.
2. Challenges to the court's failure to give a jury concurrence instruction
We next write to address defendant's challenge to the court's failure to instruct the jury on the need to concur on the way in which defendant committed the 23 counts of robbery. Defendant argues that he was entitled to have **381 the jury instructed that "ten or more must agree" on the theory of guilt on the robbery charges, because the legislature intended "to enact two distinct ways of committing" the underlying crime of robbery in the third degree, ORS 164.395(1). See *343 State v. Boots , 308 Or. 371, 379, 381, 780 P.2d 725 (1989) (identifying "serious constitutional doubts" when jury instructions permitted a conviction for aggravated murder even though "none of the alternative ways has been proved to the satisfaction of all jurors"); State v. Pipkin , 354 Or. 513, 522, 316 P.3d 255 (2013) (explaining that whether jurors must agree on particular theory of guilt depends on whether "the legislature intended to provide two ways of proving a single element"). We highlight defendant's argument regarding the effect of ORS 164.395(1) because it presents a question that this court has yet to resolve. But we leave that resolution for another case because, on this record, the failure to give a concurrence instruction would not provide a basis for reversing the judgment. See Or. Const., Art. VII (Amended), § 3 (specifying that a judgment shall be affirmed on appeal, "notwithstanding any error committed during the trial," if the court concludes "that the judgment of the court appealed from was such as should have been rendered in the case"); State v. Davis , 336 Or. 19, 32, 77 P.3d 1111 (2003) (describing the constitutional test as consisting of "a single inquiry: Is there little likelihood that the particular error affected the verdict?").[10]
When applying the constitutional test for affirmance despite error in the context of a trial court's failure to give a jury instruction-including a concurrence jury instruction-"the court considers the instructions as a whole and in the context of the evidence and record at trial, including the parties' theories of the case with respect to the various charges and defenses at issue." State v. Ashkins , 357 Or. 642, 660, 357 P.3d 490 (2015). In Ashkins , the defendant was charged with sex offenses that were alleged as a single occurrence, but there was evidence of multiple, separate **382 occurrences that could have supplied a factual basis for the jury to find the defendant guilty. Id. at 643, 357 P.3d 490. Under those circumstances, this court held, the trial court erred in failing to instruct the jury that it needed to "agree on which factual occurrence constituted the offense." Id. at 659, 357 P.3d 490 (internal quotation marks omitted). We nevertheless concluded "that there is little likelihood that, if it had been given the concurrence instruction that defendant requested, the jury would have reached a different result" and affirmed the judgment as directed by Article VII (Amended), section 3. Id. at 664, 357 P.3d 490.
In explaining why there was no basis to reverse the judgment, this court emphasized that the defendant's theory of defense consisted of denying that any of the alleged sexual acts occurred and questioning the victim's credibility as a whole, with no challenge to the victim's description of any particular occurrence, and "no alibi defense, nor any defense that [the victim] had misidentified the perpetrator," for any of the described occurrences. Id. at 662, 357 P.3d 490. Thus, "there was nothing to indicate that, in evaluating the evidence to determine if those offenses had been committed, the jury would have reached one conclusion as to some of the occurrences but a different conclusion as to others." Id. at 662-63, 357 P.3d 490.
The record here leads us to the same conclusion. There is nothing in the record from which to conclude that, in finding defendant guilty of the robberies, some jurors could have found that defendant intended to overcome the victims' "resistance to the taking of the property" without also finding that he intended to compel the victims "to deliver the property," or vice versa . Defendant did not challenge any of the evidence about his actions or intent in committing the robberies. Rather, his theory of defense during the guilt phase-as counsel emphasized in opening statement and closing argument-consisted of challenging the evidence that he "personally and intentionally" caused Gutierrez's death because the jury could not rely on Crabtree or Breckenridge as a credible source of "what went on inside that residence." Indeed, defense counsel told the jury in opening statement that defendant "admitted *344 these bank robberies and at the end of the trial, you're going to convict him of the bank robberies." Defense counsel reiterated in closing argument that "[defendant] committed the **383 bank robberies" and also urged the jury to find defendant guilty of the lesser-included offense of felony murder by finding that Gutierrez "lost his life as a result of this robbery of his vehicle and the commission of the other robberies."
The defense's narrow focus on the circumstances of the murder is not surprising, given the consequences for defendant if convicted of aggravated murder. But the defense's approach means that, on this record, there is no basis to suspect that the jury's finding of guilt on the robbery counts was affected by the court's refusal to give a concurrence instruction. Accordingly, we decline to resolve defendant's claim that he was entitled to a jury concurrence instruction on the robbery counts because the asserted error would not supply a basis for this court to reverse the judgment.
C. Challenges to Penalty-Phase Rulings
Defendant raises 11 assignments of error that challenge Oregon's death penalty or the jury's consideration of the death penalty in this case. Most present facial constitutional challenges that this court previously has rejected, and we reject those assignments of error without written discussion.[11] We write only to address two constitutional challenges that this court has not yet expressly addressed: (1) defendant's argument that Oregon unconstitutionally imposes the death penalty based on a defendant's propensity to engage in violent conduct; and (2) defendant's challenge to the imposition of the death penalty while the Governor's moratorium on that penalty is in effect. As explained below, we reject those challenges as well.
1. Defendant's challenge to the second death penalty question
Oregon's death penalty statute, ORS 163.150, specifies that the trial court must conduct "a separate sentencing **384 proceeding" after a jury has found a defendant guilty of aggravated murder. ORS 163.150(1)(a). At the conclusion of that sentencing proceeding, the trial court must instruct the jury to answer a series of questions that determine whether the defendant will be sentenced to death:
"(b) Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;
"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;
"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and
"(D) Whether the defendant should receive a death sentence."
ORS 163.150(1)(b). If the jury unanimously answers "yes" to all of the questions it considers, then the defendant is sentenced to death. ORS 163.150(1)(e), (f). Otherwise, the defendant is sentenced to life imprisonment. ORS 163.150(2)(a).
Defendant argues that, by imposing a death sentence only if "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society"-the second question-Oregon effectively punishes a defendant based on his or her propensity to engage in violent conduct. According to defendant, punishing a defendant more severely on that basis violates the Eighth Amendment *345 prohibition on punishing a person purely on the basis of status.[12] We disagree.
The Supreme Court has held that punishment purely on the basis of status "inflicts a cruel and unusual **385 punishment in violation of the Fourteenth Amendment." Robinson v. California , 370 U.S. 660, 667, 82 S.Ct. 1417, 1420-21, 8 L.Ed.2d 758 (1962) (invalidating as "cruel and unusual punishment" a state law that punished the " 'status' of narcotic addiction"). In Robinson , the Court emphasized that narcotic addiction is an illness and held "that a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment[.]" Id. at 667, 82 S.Ct. 1417.
Defendant argues that Robinson prohibits states from punishing the "mere propensity to commit an offense" and that it is equally impermissible to "punish one defendant more severely than another based on a mere propensity." However, the Eighth Amendment does not prohibit punishment on the basis that a person's status has lead him to commit "some act, [or] engage[ ] in some behavior, which society has an interest in preventing." Powell v. State of Tex. , 392 U.S. 514, 533, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (rejecting argument that law punishing the act of being drunk in a public place on a specific occasion was punishment for the status of being a chronic alcoholic). Although the Supreme Court has not considered the precise challenge that defendant now raises to the second question, the Court expressly "has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system." Simmons v. South Carolina , 512 U.S. 154, 162, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). We are not free to disregard that decision, and defendant offers no separate argument under the Oregon Constitution.
2. Defendant's challenge to allowing the jury to vote for the death penalty during the Governor's moratorium on carrying out that penalty
Defendant next argues that a jury cannot constitutionally vote to impose the death penalty during a time when the Governor has imposed a moratorium on the carrying out of such sentences. Defendant's challenge depends on Caldwell v. Mississippi , in which the United States Supreme **386 Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. 320, 328-29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). However, the trial court here instructed the jury in a way that eliminated the constitutional concern at issue in Caldwell .
The prosecutor in Caldwell argued to the jury that the defense "would have you believe that you're going to kill this man and they know-they know that your decision is not the final decision. *** Your job is reviewable." Id. at 325, 105 S.Ct. 2633. The Supreme Court reversed the sentence of death, explaining that "the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." Id. at 333, 105 S.Ct. 2633.
Unlike the jury in Caldwell , however, defendant's jury was expressly instructed not to minimize the importance of its death penalty determination. Before the jury heard any evidence, the court gave preliminary instructions, including an instruction that expressly cautioned the jury regarding the moratorium that Oregon's then-governor had imposed on carrying out the death penalty. See generally Helen Jung, Gov. John Kitzhaber stops executions in Oregon, calls system "compromised and inequitable," The Oregonian (Nov. 22, 2011), https://www.oregonlive.com/pacific-northwest-news/index.ssf/2011/11/gov_john_kitzhaber_stops_all_e.html (accessed *346 Jan. 28, 2019).[13] The court instructed the jury that, "[i]n legal terms," the Governor's moratorium granted "temporary reprieves of existing death sentences" but that the jury "should assume that death sentences handed down while he is Governor will ultimately be carried out." That instruction corrected any impression that the jurors may have had about the meaning of the moratorium and **387 reinforced that, if they voted to sentence defendant to death, that sentence would "ultimately be carried out."
D. Challenge to Post-Judgment Ruling Denying a Mistrial
Finally, we address defendant's challenge to the trial court's refusal to grant a mistrial on the basis of an alternate juror's undisclosed bias. After the trial court entered judgment, it became apparent that one of the alternate jurors-contrary to her answers during jury selection-had seen court-file information about defendant's crimes and had formed an opinion that defendant "needs to die." We agree with defendant that the individual harbored the kind of undisclosed bias that raises grave concerns about a defendant's right to a fair trial. In this case, however, we are persuaded that the alternate juror's bias had no effect on the jurors who actually determined defendant's guilt and penalty and, thus, conclude that defendant is not entitled to a new trial.
There is no real dispute about the facts on which defendant bases his claim that he is entitled to a new trial. While the case was pending in this court on automatic and direct review, the trial court notified the parties that it had received a copy of an email message that one of the alternate jurors had written before jury selection, in which she had described inside knowledge about details of the crimes and an opinion that defendant "needs to die." The individual, who was in a position to have extra-judicial knowledge of defendant's case, sent the email after learning that she had been summoned for jury service in defendant's murder trial. In it, she wrote:
"He is the guy who (with the 2 younger black kids from Portland) killed a boy (and chopped him up in pieces and burned his body) and took his car to Florence to rob a bank. He was out of prison for a couple of years for murder in the 70's. He needs to die. There is no way I would get on that jury, and not sure I would want to hear the details after reading the search warrants. I will have to defer."
Upon learning of the email, counsel for defendant asked this court to order a limited remand. This court granted the remand for the trial court to determine "whether the alternate juror engaged in juror misconduct and, if she did, **388 whether her misconduct tainted the other jurors' consideration of the case."[14] On remand, the trial court questioned all of the jurors and alternate jurors, except for Moser, the alternate whose conduct was at issue. The court asked each juror and alternate juror the same 10 questions about whether Moser disclosed specific pieces of information about the crimes and more generally, whether Moser said "anything" about defendant or the crimes beyond what the juror heard in court and whether Moser ever mentioned other crimes or acts of violence that defendant had allegedly committed.
At the conclusion of the remand hearing, the trial court drafted an extensive report in which the court described the results of its remand investigation and made findings about the questions identified in this court's remand order. The court found that a number *347 of Moser's answers during jury selection had been "inconsistent with the statements made in her email." Those answers primarily responded to questions that counsel had asked Moser during a voir dire conducted outside the presence of the other prospective jurors. In response to questions about contact that she may have had with defendant's case, Moser had insisted that she had no knowledge about the case and had not "formed any opinions about this case or what the outcome of the case should be."
The court observed that, in answering the jury selection questions, "it is clear that Ms. Moser did not accurately disclose the strength of her feelings about what punishment [defendant] deserved during voir dire ." The court also emphasized that, if Moser had "been involved in the deliberations during either phase of this case, this lack of candor would give rise to significant concerns about the fairness of the trial."
**389 The trial court explained, however, that Moser was seated as one of four alternate jurors in the case and that "none of the alternate jurors participated in deliberations during either the guilt/innocence or sentencing phases of the case." The court also reported that "[n]ot one of the jurors questioned by the court remembered Ms. Moser ever disclosing to them facts that were not in the record." Of the 12 jurors who participated in deliberations, seven "affirmatively stated that Ms. Moser had never discussed with them any facts relating to the case or to Mr. Taylor." The court also described in detail the testimony of the remaining five jurors who participated in the deliberations. None remembered Moser disclosing any information or opinions about the case. Each answered "no" to most of the 10 questions asking about types of information Moser might have mentioned and, to the extent the juror simply could not remember if Moser mentioned a particular fact or an opinion about the case, the juror added that he or she probably would have remembered such a comment.
Defendant argues that the answers of the questioned jurors left open the potential that Moser's bias deprived him of his constitutional right to trial by an impartial jury and require this court to grant a new trial. We conclude that, on this record, defendant is not entitled to a new trial.[15]
Defendant first argues that Moser's email displays the kind of bias and extra-judicial knowledge that, if disclosed during jury selection, would have allowed him to exclude her from his jury. We agree that the information contained in Moser's email would be a reason to exclude her for cause from the jury. See ORCP 57 D(1)(g) (applying in criminal proceedings, ORS 136.210(1), and providing that a challenge for cause may be sustained if the juror "has formed or expressed an opinion upon the merits of the cause from what the juror may have heard or read" and if the court is satisfied "that the juror cannot disregard such opinion **390 and try the issue impartially"). Both Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution provide a criminal defendant the right to a trial "by an impartial jury." As this court has explained, the "guarantee of trial by an 'impartial jury' means trial by a jury that is not biased in favor of or against either party, but is influenced in making its decision only by evidence produced at trial and legal standards provided by the trial court." State v. Amini, 331 Or. 384, 391, 15 P.3d 541 (2000).
Here, Moser wrote in her email that defendant had "killed a boy," and "rob[bed] a bank," and that "[h]e needs to die." When a potential juror has decided to vote for the death penalty regardless of the evidence that may be presented, "the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment," allows the capital defendant to challenge the juror for cause. Morgan v. Illinois , 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). Moreover, "[i]f even one such juror is *348 empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." Id.
However, the purpose of allowing lawyers to challenge a prospective juror for cause is to allow the court to excuse prospective jurors whose "ideas or opinions would impair substantially his or her performance of the duties of a juror to decide the case fairly and impartially on the evidence presented in court." State v. McAnulty , 356 Or. 432, 462, 338 P.3d 653 (2014) (internal quotation marks and citations omitted). Neither Moser nor any of the other alternate jurors participated in the jury's decisions about the case. Thus, as the trial court reasoned, Moser's failure to candidly disclose her familiarity with the case could have affected defendant's right to an impartial jury only if she somehow had influenced the jurors who decided defendant's case, such as by sharing her information or bias with them. See State v. Pratt , 316 Or. 561, 574-75, 853 P.2d 827 (1993).
In Pratt , the defendant moved for a mistrial when it came to light during jury deliberations that an alternate juror had made a statement to the bailiff that reflected premature judgment of an issue to be decided in the penalty **391 phase. Id. at 573-74, 853 P.2d 827. The trial court denied a mistrial, reasoning that the comment "did not introduce any prejudice toward the defendant" because none of the jurors overheard the comment. Id. at 574, 853 P.2d 827. This court affirmed the denial of a mistrial and expressed approval for the trial court's method of assessing possible prejudice by considering whether the views of the alternate juror had any effect on the jurors who decided the case. Id. at 574-75, 853 P.2d 827.
In this case, as in Pratt , the trial court observed after questioning all of the jurors that "[t]here is no evidence to suggest that Ms. Moser disclosed her knowledge or feelings to the jurors who participated in the deliberations." Defendant does not contend that there is evidence to contradict that finding.[16] Indeed, there is no evidence that Moser expressed her bias to anyone connected with the trial, making the possibility of improper influence even less likely than in Pratt . Thus, under the framework that this court endorsed in Pratt , the trial court correctly denied the motion for new trial.[17]
Defendant argues, however, that this court should recognize a presumption that the presence of a biased alternate juror taints the jurors who decided the case and requires a new trial unless the state produces affirmative evidence to rebut the presumption. In support of that proposed rule, defendant relies on federal cases that recognize a different presumption-that if the jurors who decided the case actually are exposed to improper information, then there may **392 be a presumption that the exposure tainted the verdict. For example, defendant cites Remmer v. United States , in which the Supreme Court held: "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial," unless the government establishes that the improper contact was harmless. 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954). See also *349 Dickson v. Sullivan , 849 F.2d 403, 405 (9th Cir 1988) ("A defendant is entitled to a new trial when the jury obtains or uses evidence that has not been introduced during trial if there is 'a reasonable possibility that the extrinsic material could have affected the verdict.' " (Quoting Marino v. Vasquez , 812 F.2d 499, 504 (9th Cir 1987) (emphasis in Vasquez ).).
This court, similarly, has employed a standard that could be described as a "presumption of prejudice" when the jurors who decided a criminal case were exposed to an improper influence, as long as the exposure created a sufficiently "great [ ] risk" that the improper exposure influenced the jury's decision. See State v. Sundberg , 349 Or. 608, 625, 247 P.3d 1213 (2011). In Sundberg , the trial court ruled that jurors selected for the defendant's case would be anonymous, a protection that this court emphasized "can cause prejudice to a defendant by suggesting to jurors that the defendant may be dangerous and, by extension, guilty." Id. at 624-25, 247 P.3d 1213. This court emphasized that specific circumstances of the case made the risk of prejudice "particularly great" and ultimately concluded that the trial court's unjustified "use of an anonymous jury created too great a risk that the jury may have believed that defendant was dangerous-and, therefore, that he was more likely to be guilty, denying defendant the right to a trial by an impartial jury." Id. at 625, 247 P.3d 1213. See also Lambert v. Srs. of St. Joseph , 277 Or. 223, 231, 560 P.2d 262 (1977) (when voir dire answers of prospective juror revealed "substantial probability of bias," the trial court's "failure to allow the juror to be excused for cause is presumed to be prejudicial").[18]
**393 However, neither the federal cases on which defendant relies nor the decisions from this court apply a presumption of prejudice when there is not even evidence that the jurors were exposed to an improper consideration. There is a significant difference between presuming that a defendant's right to an impartial jury has been impaired by improper influence when the jurors actually were exposed to improper considerations and defendant's proposal that we should presume that the jury was improperly influenced when there is no evidence that jurors were exposed to improper considerations. Defendant offers no authority, nor any persuasive rationale, for expanding the former presumption to include the latter, and we decline to do so.
In the present case, although the evidence of bias by the alternate juror was significant, and indeed not seriously disputed, there is no evidence that her bias affected the jury's verdict. As an alternate, she was excused before the jury began deliberating toward a verdict, there is no evidence that she disclosed any information about the case to the other jurors, and there is no evidence that any member of the jury disregarded the court's preliminary instruction to "not discuss this case with other jurors until you begin your deliberations at the end of this case." Under the circumstances, we will not presume that the alternate juror impaired defendant's right to an impartial jury, and we conclude that defendant is not entitled to a new trial.
IV. CONCLUSION
We have examined each of defendant's 131 assignments of error and the arguments that defendant advances in support of them. We conclude that none of defendant's challenges identifies an error that would be a basis for reversing the judgment.
The judgment of conviction and sentence of death are affirmed

ORS 138.012(1) (2013) provided, in part: "The judgment of conviction and sentence of death entered under ORS 163.150 (1)(f) is subject to automatic and direct review by the Supreme Court." The legislative counsel renumbered the direct review statute in 2017, and those provisions are now set out at ORS 138.052.

Because we conclude that defendant has raised no meritorious challenge to the evidence supporting his convictions or to the evidence that permitted the sentence of death, we provide only a cursory description of the horrific crimes committed against Gutierrez and the extensive evidence of defendant's responsibility for those crimes.

With respect to defendant's challenges to two other significant pretrial rulings that we do not address-(1) the court's denial of defendant's motion to suppress evidence as obtained in violation of his right to counsel during a custodial interrogation and (2) the trial judge's refusal to recuse himself because of an asserted appearance of partiality arising from social contact with counsel for a key witness for the state-we conclude that the issues are fully resolved by prior decisions. See State v. Kell , 303 Or. 89, 99-100, 734 P.2d 334 (1987) (no violation of defendant's right against self-incrimination when, "there was no interrogation by the police following defendant's first statement of interest in an attorney," but the "defendant just kept on talking" until he clarified that he was willing to answer some questions but not others); State v. Langley , 363 Or. 482, 507, 424 P.3d 688 (2018) (emphasizing that the only circumstances in which the United States Supreme Court has held that due process requires recusal without actual bias are circumstances in which " 'the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable,' " and concluding that circumstances the defendant identified as creating an "appearance" of partiality were not "even remotely analogous" (quoting Caperton v. A.T. Massey Coal Co. , 556 U.S. 868, 877, 129 S. Ct. 2252, 173L.Ed.2d 1208 (2009) )).

In demurring to the indictment, defendant also argued that some of the counts improperly charged as a single offense conduct that actually amounts to multiple offenses of kidnapping. The trial court correctly concluded that the challenged counts merely alleged alternative means of committing a single offense of kidnapping, as permitted by ORS 132.560(1)(a).

Most of the alleged facts are elements of the offense of third-degree robbery. ORS 164.395. A person commits the crime of robbery in the first degree by committing third degree robbery with one additional circumstance, including being "armed with a deadly weapon." ORS 164.415.

A person commits robbery in the second degree by committing third-degree robbery with one additional circumstance, including that the person "[r]epresents by word or conduct that the person is armed with what purports to be a dangerous or deadly weapon[.]" ORS 164.405.

We do not suggest that all crimes of robbery are, necessarily, of the same or similar character. But, at the demurrer stage, the question is whether the indictment sufficiently alleges the basis for joinder under ORS 132.560(1)(b). If the indictment is sufficient, a defendant who believes that joinder is improper is free to move to sever and seek a determination of that issue. See Warren , 364 Or. at 122, 430 P.3d 1036 (explaining that proper joinder can be challenged through a demurrer to the indictment or through a motion to sever or a motion to elect if it appears that the evidence is insufficient to support joinder).

We reject without detailed discussion defendant's argument that the joinder caused his trial to be fundamentally unfair, in violation of his rights under the Due Process Clause of the United States Constitution. Defendant identifies one decision in which the Ninth Circuit held that joinder of a weaker murder case with a stronger murder case rose to the level of a due process violation as to the weaker case. Bean v. Calderon , 163 F.3d 1073, 1083 (9th Cir 1998). But the Ninth Circuit has since emphasized that the circumstances of Bean were unique and held that, "[i]n order to demonstrate actual unfairness, * * * [the defendant] must show that the jury was actually inflamed." Park v. California , 202 F.3d 1146, 1150 (9th Cir 2000). Defendant has offered no basis to conclude that a trial on properly joined charges could be fundamentally unfair when the joinder does not cause substantial prejudice.

In a decision that this court appears to have decided only under the federal constitution, the court emphasized that, "although a trial court may not exclude a prospective juror for cause solely because he has general objections to the death penalty, * * * a court may exclude a prospective juror whose views on the death penalty would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " State v. Nefstad , 309 Or. 523, 538, 789 P.2d 1326 (1990) (quoting Wainwright v. Witt , 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) ).

The correct focus of the constitutional inquiry "is on the possible influence of the error on the verdict rendered, not whether this court, sitting as factfinder, would regard the evidence of guilt as substantial and compelling." Davis , 336 Or. at 32, 77 P.3d 1111. The expression "harmless" error is a shorthand reference to the constitutional standard, although it is not "an entirely accurate descriptor of the legal analysis that the constitution requires." Id. at 27, 77 P.3d 1111.

One of defendant's assignments of error challenges Oregon's method of execution by lethal injection, rather than the sentence of death itself. (Assignment of Error # 129). His argument is indistinguishable from an argument that this court has held "is not ripe for consideration by this court, nor will it be until all direct and collateral review proceedings have concluded and a death warrant has issued." State v. Washington , 355 Or. 612, 662, 330 P.3d 596 (2014).

The Eighth Amendment prohibition against "cruel and unusual punishments" is applicable to the states through the Due Process Clause of the Fourteenth Amendment. Baze v. Rees , 553 U.S. 35, 47, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008).

Oregon's current governor, Kate Brown, announced upon taking office in 2015 that she plans to continue the moratorium. See generally Tony Hernandez, Brown to maintain death penalty moratorium , The Oregonian (Oct. 17, 2016), https://www.oregonlive.com/pacific-northwest-news/index.ssf/2016/10/brown_to_maintain_death_penalt.html (accessed Jan. 28, 2019).

UTCR 3.120(2) provides:
"(2) After a sufficient showing to the court and on order of the court, a party may have contact with a juror in the presence of the court and opposing parties when:
"(a) There is a reasonable ground to believe that there has been a mistake in the announcing or recording of a verdict; or
"(b) There is a reasonable ground to believe that a juror or the jury has been guilty of fraud or misconduct sufficient to justify setting aside or modifying the verdict or judgment."

The trial court denied defendant's motion for new trial on the basis of procedural obstacles that the state raised-that granting a new trial was beyond the scope of this court's instructions on remand and that the motion was untimely. Although defendant challenges those conclusions on appeal, we decline to address the procedural arguments given our conclusion that defendant is not entitled to a new trial.

Defendant cites the testimony of another alternate juror-that it was "possible" Moser expressed an opinion about "what she thought should happen to Mr. Taylor"-as evidence "that Moser may not have adhered to" the rule against jurors discussing the case. But the alternate juror's statement about "possible" improper discussion is not evidence that Moser actually expressed her opinion to any of the jurors who decided the case, and defendant does not contend otherwise. Indeed, the alternate clarified that she had "no specific memory of [Moser] making a statement about that."

Although this court will review a trial court's denial of a motion for new trial for an abuse of discretion when that ruling is based on a matter committed to the trial court's discretion, we understand defendant's argument to raise a challenge that we review for legal error: whether the undisputed facts deprived him of a fair trial before an impartial jury. See State v. Sundberg , 349 Or. 608, 623-24, 247 P.3d 1213 (2011) (explaining why court reviewed denial of new trial for legal error when defendant's challenge raised the legal argument that he was denied his constitutional right to an impartial jury).

When the risk that an outside influence poses to a jury's impartiality is less extreme, this court has routinely declined to imply or assume prejudice. See State v. Rogers , 313 Or. 356, 372, 836 P.2d 1308 (1992) (defendant's claim that court should treat fact of employment with the state as indication that juror implicitly biased was not a basis for concluding "that defendant's state or federal constitutional rights to a fair and impartial jury were violated" (emphasis in original)).