50 March 19, 2025 No. 230

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ANTONIO VASQUEZ-REYES,
*Defendant-Appellant.*

Marion County Circuit Court
21CR27939, 21CR39892;
A179373 (Control), A179374

Jodie A. Bureta, Judge.

Submitted June 17, 2024.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Zachary Lovett Mazer, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Kirsten M. Naito, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Lagesen, Chief Judge, and Joyce, Judge.

AOYAGI, P. J.

Affirmed.

## AOYAGI, P. J.

Defendant appeals his convictions for numerous crimes charged in two indictments that were consolidated before trial. The first indictment related to an incident on April 17, 2021, when defendant met a woman, R, in a restaurant, asked her for a ride home, compelled her to drive him around for some time, and then robbed her of her jewelry. Based on that incident, defendant was convicted of second-degree kidnapping, ORS 163.225, second-degree robbery, ORS 164.405, and coercion, ORS 163.275. The second indictment related to an incident on June 24, 2021, in which defendant entered S's home with a gun while visibly intoxicated, made S drive around with him in S's car for several hours, coerced money and beer from S, eventually traded S's freedom for the keys to S's stepmother's sports car, and fled a short while later when the police tried to stop him in the sports car. Based on that incident, defendant was convicted of second-degree kidnapping with a firearm, ORS 163.225, ORS 161.610; first-degree burglary with a firearm, ORS 164.225, ORS 161.610; felony unauthorized use of a vehicle (UUV), ORS 164.135; first-degree robbery with a firearm, ORS 164.415, ORS 161.610; coercion with a firearm ORS 163.275, ORS 161.610; and fleeing a police officer, ORS 811.540.

On appeal, defendant raises five assignments of error. In his first and second assignments, defendant challenges the denial of two pretrial motions to exclude R from making an in-court identification of him at trial. The third assignment is directed to the consolidation of the indictments. In his fourth and fifth assignments, defendant challenges an evidentiary ruling at trial and related limitation on closing argument.

We affirm. We first address consolidation, because it is a predicate issue, and conclude that there was no error in consolidating the indictments. We then address R's in-court identification of defendant at trial, explaining why the court did not err in denying the pretrial motions. We summarily reject the last two assignments of error.[1]

---

[1] For the benefit of the parties, we briefly explain our rejection of the fourth and fifth assignments of error, which relate to defendant's attempt to admit

## I.   CONSOLIDATION

Defendant was separately indicted in connection with each incident. Each indictment alleged that the charges within that indictment were connected as part of a "common scheme or plan" and involved acts of the "same or similar character." *See* ORS 132.560(1)(b) (describing circumstances in which "[t]wo or more offenses may be charged in the same charging instrument in a separate count for each offense").

Before trial, the state moved to consolidate the indictments and thus join the charges, based on the charges being of the same or similar character. *See* ORS 132.560(2) (allowing consolidation of two or more charging instruments in the same circumstances that allow joinder of charges in a single charging instrument); ORS 132.560(1)(b)(A) (allowing joinder of offenses that are "[o]f the same or similar character"). The state focused on the similarity between the kidnapping, robbery, and coercion charges in each case, which it characterized as the "drivers" of both cases. Defendant opposed consolidation, arguing that the charged offenses in the two cases were too factually dissimilar. After a hearing, the trial court granted the state's motion, reasoning that, although the charges in the two cases did not overlap completely, they were of the same or similar character, in that both incidents involved defendant "commandeering people to do things arguably by threat of a firearm and for purposes of depriving people of their property." Defendant claims error, whereas the state maintains that the court properly consolidated the indictments.

"We review a trial court's determination that the state met the statutory requirements for joinder of charges

---

evidence of items found in S's stepmother's car as bias evidence. In short, we agree with the state that defendant's theory of bias required an impermissible stacking of inferences to the point of speculation. *See State v. Phillips*, 245 Or App 38, 46, 261 P3d 55 (2011), *rev den*, 351 Or 545 (2012) (affirming the denial of a motion to admit certain evidence as bias evidence, because "reasonable inferences are permissible but speculation is not[,]" and "the string of inferences defendant would have us unwind is simply too long") (internal quotation marks omitted); *see generally State v. Bivins*, 191 Or App 460, 468, 83 P3d 379 (2004) (factfinders are not permitted to make inferences that require "too great an inferential leap" or the "stacking of inferences to the point of speculation") (internal quotation marks omitted). On this record, the trial court did not err by excluding the exhibits and imposing a related limitation on closing argument.

for legal error." *State v. Brown*, 326 Or App 46, 48, 531 P3d 178, *rev den*, 371 Or 332 (2023) (internal quotation marks omitted). In determining whether the charges were of the "same or similar character" within the meaning of ORS 132.560(1)(b)(A), we consider "factors such as the temporal proximity of the acts, similarities in the elements of the offenses, whether there will be similar evidence or evidentiary overlap, and whether the charges involve the same or similar victims, locations, intent, modus operandi, or acts." *Id.* at 52 (internal quotation marks omitted).

Here, the trial court did not err by granting consolidation. The Supreme Court's decision in *State v. Taylor*, 364 Or 364, 434 P3d 331 (2019), is instructive. The defendant in *Taylor* was accused of robbing a bank in June, robbing a different bank in August, and kidnapping and murdering a young man a few hours before the August bank robbery. *Taylor*, 364 Or at 366-70. On direct review (because he was sentenced to death), the defendant argued, as he had unsuccessfully to the trial court, "that the indictment improperly joined charges arising out of the June bank robbery incident with charges arising out of the August bank robbery, kidnapping and murder." *Id.* at 373.

The Supreme Court held that joinder was proper. *Id.* The court explained that the 10 charges related to the June bank robbery could be joined with the 12 charges related to the August bank robbery because they were of the same or similar character, even if there were some factual differences between the incidents. *Id.* at 374 (describing similarities in how defendant committed each bank robbery). The charges for kidnapping and murdering the young man could be joined "because they were part of a 'common scheme or plan' to commit the [August] bank robbery—to steal a car to use to commit the robbery and to kill the owner so that the theft would not be discovered before the robbery." *Id.* Finally, two charges of unlawful possession of a firearm could be joined "because the firearms that defendant unlawfully possessed were the firearms that he used during each robbery, making his unlawful possession of the firearms part of the 'common scheme or plan' to commit the robberies." *Id.*

In this case, defendant was accused of engaging in similar conduct on two separate occasions: starting an encounter with a stranger, making the person drive him around, obtaining cooperation by threat of a firearm, and eventually robbing the person. Each of those incidents resulted in charges for kidnapping, robbery, and coercion. We readily conclude that the charges of kidnapping, robbery, and coercion in the two cases were of the same or similar character, notwithstanding factual differences in the details of the two incidents, such that they were properly joined. *See id.* (reaching similar conclusion as to the defendant's two bank robberies).

The additional charges in the second case do not render the consolidation improper. The burglary charges were based on defendant entering or remaining in S's home with the intent to kidnap him, making them part of the same scheme or plan as his kidnapping, robbing, and coercing S. The UUV charges were based on defendant unlawfully exercising control of two vehicles as part of the incident involving S—first, S's own car and, later, S's stepmother's sports car—making them part of the same scheme or plan as the other charges relating to S. Finally, the charge for fleeing a police officer was based on defendant fleeing when the police tried to stop him in the stolen sports car shortly after he committed the crimes against S (on the same day), which is enough to establish that fleeing the police was part of a common scheme or plan with the other crimes that day. Thus, the additional charges are like the kidnapping and manslaughter charges that were properly joined in *Taylor*. *See id.* at 374.

For those reasons, we conclude that the trial court did not err by consolidating the indictments before trial.

## II.   IN-COURT IDENTIFICATION OF DEFENDANT

We next consider defendant's assignments of error challenging the denial of his pretrial motions seeking to exclude R from identifying him in court at trial as the perpetrator of the April 2021 crimes. The trial court held evidentiary hearings on those motions in September 2021 and April 2022, respectively, and denied both motions. We begin

by describing the general analytical framework for deciding whether to admit eyewitness identification evidence, which is grounded in the Oregon Evidence Code and aims to "strike a proper balance between the utility of that evidence in convicting the guilty and its proclivity, on occasion, to inculpate the innocent." *State v. Lawson/James*, 352 Or 724, 749, 291 P3d 673 (2012). We then address the record and arguments in this case, ultimately concluding that the trial court did not err in denying the pretrial motions.

A.  *General    Analytical    Framework    for    Eyewitness Identification Evidence*

When an eyewitness identification is challenged, its proponent, typically the state, has the burden to establish the foundation for that evidence. Establishing a foundation "implicates three interrelated evidentiary concepts: relevance under OEC 401, personal knowledge under OEC 602, and lay opinion under OEC 701." *State v. Hickman*, 355 Or 715, 728, 330 P3d 551 (2014), *adh'd to as modified on recons*, 356 Or 687, 343 P3d 634, *cert den*, 577 US 896 (2015). OEC 701 applies because eyewitness identification is considered "a kind of lay opinion testimony," in that the witness must rely on certain inferences and assumptions to reach a reasoned conclusion that the person before them is the same person who was previously observed. *Lawson/James*, 352 Or at 753-54.

Thus, to establish the necessary foundation, the state must first show that the identification is relevant. *Hickman*, 355 Or at 728. Evidence is relevant "so long as it increases or decreases, even slightly, the probability of the existence of a fact that is of consequence to the determination of the action." *State v. Barone*, 329 Or 210, 238, 986 P2d 5 (1999). Next, the state must show that the witness has "the personal knowledge necessary to make an identification[.]" *Hickman*, 355 Or at 728 (citing OEC 602). That requirement is satisfied "if the eyewitness testifies to facts that, if believed, would permit a reasonable juror to find that the eyewitness observed the facts necessary to make the identification." *Id.* at 729-30; *see also id.* at 730 ("[w]hether the eyewitness actually did observe those facts is a credibility determination for the jury"). Lastly, the state must

show that the identification is both "'rationally based on the perception of the witness'" and "'helpful'" to the jury. *Id.* at 730 (quoting OEC 701) (brackets omitted). The first subpart is satisfied if the evidence supports a finding that the identification is based on the witness's own perceptions and memory, rather than subsequent influences. *Lawson/James*, 352 Or at 754-56. The second subpart is satisfied if the witness's opinion on identification "communicates more to the jury than the sum of the witness's describable perceptions." *Id.* at 756.

In deciding whether the state has laid a sufficient foundation, the court should consider two categories of factors that affect the reliability of eyewitness identification according to scientific research. One category, called "estimator variables," has to do with the circumstances that existed when the person witnessed the original event, *i.e.*, characteristics of the witness, characteristics of the alleged perpetrator, and environmental conditions. *Id.* at 740. The other category, "system variables," has to do with procedures used after the original event to obtain an eyewitness identification, *i.e.*, "circumstances surrounding the identification procedure itself that are generally within the control of those administering the procedure." *Id. Lawson/James* focused on "suggestive police procedures," 352 Or at 755, but *Hickman* explained that "suggestive procedures also can be administered by other state actors," 355 Or at 734. As described in *Hickman*:

"System variables include factors such as whether the identification procedure was conducted by a person who was unaware of the suspect's identity; whether preidentification instructions were given to reduce the likelihood of misidentification; the manner in which any photographic lineup was constructed and presented to the witness; whether multiple viewings of the suspect led to confusion; whether suggestive wording or leading questions by investigators contaminated the witness's memory; and whether post-identification confirmatory feedback falsely inflated the witness's confidence in the accuracy of his or her identification."

355 Or at 725 n 5. For purposes of establishing a foundation, estimator variables are particularly significant to the

OEC 602 analysis, whereas system variables are important in the OEC 701 analysis. *Lawson/James*, 352 Or at 752-56.

If the state successfully establishes the necessary foundation for an identification, then "the burden shifts to the defendant" to challenge admission under OEC 403, if the defendant believes that the identification's probative value is substantially outweighed by the danger of unfair prejudice. *Id.* at 762. In deciding whether to admit the identification under OEC 403, the trial court assumes a "heightened role as an evidentiary gatekeeper because 'traditional' methods of testing reliability—like cross-examination—can be ineffective at discrediting unreliable or inaccurate eyewitness identification evidence." *Id.* at 758.

On appeal, we review OEC 401, 602, and 701 rulings for legal error, while deferring to the trial court's findings of fact if supported by evidence, and we review OEC 403 rulings for abuse of discretion. *Lawson/James*, 352 Or at 762 (regarding OEC 403); *State v. Titus*, 328 Or 475, 481, 982 P2d 1133 (1999) (regarding OEC 401); *State v. Harrell*, 292 Or App 348, 349, 424 P3d 817 (2018) (regarding OEC 602 and 701).

B.  *The Pretrial Motions and Hearings*

Defendant was charged with the crimes against R. In September 2021, he filed a pretrial motion to exclude R and three other eyewitnesses from identifying him in court at trial. He argued that in-court identification is inherently unreliable due to the suggestiveness of the procedure, and that R's identification was additionally unreliable because she did not conclusively identify him in a police photo lineup. Defendant requested a hearing on the motion, which was held on September 17, 2021.[2]

---

[2] To be precise, on September 10, 2021, defendant filed a motion and 20-page memorandum seeking to exclude any in-court identification at trial, which was set for hearing on September 17, 2021. On the evening before the hearing, defendant filed a two-page motion that reiterated his existing request for exclusion and added an alternative request that, if the court allowed in-court identification at trial, it require a "pretrial lineup" for those witnesses who did not conclusively identify defendant in a police photo lineup. The two-page motion did not mention the hearing scheduled for the next day, but it was nonetheless folded into that hearing, with defendant including in his hearing arguments an alternative request for "prophylactic" measures at trial, such as an "in-court lineup" or "multiple people sit[ting] in the courtroom at different locations." Like the trial court, we treat the two September motions as effectively a single motion. We

At the hearing, defendant was present and seated at counsel table. The record is not entirely clear, but it appears that he was wearing a yellow jail sweatshirt and either handcuffs or shackles. The only witnesses at the hearing were Morales-Martinez and R. Morales-Martinez's testimony is not relevant on appeal, except perhaps to note that he made an in-court identification of defendant at the hearing. As for R, her testimony is summarized below. *See State v. Allen*, 312 Or App 584, 587, 494 P3d 939 (2021) (we set out the facts "as established at the pretrial hearing on defendant's motion to exclude eyewitness identification evidence, consistent with th[e] standard of review").

On April 17, 2021, R was at a Denny's playing the lottery machines. The restaurant was well-lit. A man whom she did not know was playing on the machine next to hers for about an hour. They had polite conversation, and the man would celebrate with R when she won. R could see the man clearly. He wore a mask due to pandemic rules but took it off periodically to drink. When R decided to leave, the man asked for a ride, and R agreed. It was around 1:00 p.m. R waited for the man outside for a few minutes. When he came outside, it was easy to see him, and R got a good look at him. The man got into the front passenger seat. He gave R directions but no address, and he kept changing the directions and telling her to go somewhere else.

R eventually told the man that she was going to drop him off. He told her not to do that, that he had a gun, and he put his hand near his right hip. R did not see a gun but believed him that he had one. The man told R to drive and eventually directed her to park in a field. He told R that he was in a gang. He remained in his seat, and R was scared. It was still daylight. The man stole R's jewelry, but he made her say that she was giving it to him while he reportedly recorded her on his phone. R could see the man clearly the whole time, and he removed his mask while taking her jewelry.

do not address the alternative motion for prophylactic measures at trial, however, because the trial court denied it, and defendant has not assigned error to that ruling. His arguments on appeal are limited to the trial court having erred, either under OEC 701 or OEC 403, in allowing R to make an in-court identification at trial.

The man told R to take him home. R told the man that she was not taking him anywhere. Seeing a group of people nearby, R exited the car and called for help. The man had R's cell phone, but R grabbed it away from him, and R recorded two short videos of him as he ran off. (The video was admitted into evidence at the hearing.) When the police arrived, R described what happened and showed the officer the videos on her phone. R told the officer that the man was approximately five feet 10 inches tall, with a heavy build, was wearing a blue shirt, tan pants, and white shoes, and had a tattoo on his left forearm.

Sometime after the incident, the police showed R six photos and asked if she recognized the man. R focused in on two photos. She "wasn't sure of one of them" but "was of the other one."[3] At the hearing, the six photos were admitted into evidence as an exhibit, but R was never asked to identify which two photos she had focused on or to clarify what it meant that she was sure of one and not the other. Defense counsel later represented in argument that it was the third and fifth photos that R had focused on, with the fifth photo being defendant's. At the time of the first hearing, defendant's position was that the photo of him used in the lineup was "inaccurate" because it showed him with "short" hair that was "not similar" to the haircut that he had at the time of the April 17, 2021, incident, which was longer on top than on the sides.[4]

After testifying as described above, R was asked whether she recognized the perpetrator "here in court

---

[3] R testified with an interpreter. Regarding the photos shown to her by the police, the prosecutor asked R if she was able to "pick one person," and she answered, "Yes." The prosecutor then asked whether there were "two people," and R responded, "There were two. I wasn't sure of one of them, but I was of the other one." On cross-examination, defense counsel asked if he understood correctly that there were two photos that R had "made note of." She answered, "There were two people. One I saw but it wasn't, but the other one, yes, it looked like it." Asked what she told the officers at the time, R testified, "I told the police that between those two, one of them I'm not too sure of, but I was of the other one." No one asked R to clarify what she meant.

[4] Defendant argued in his memorandum, "Law enforcement also obtained a photo of defendant that was not similar to what defendant looked [*sic*] at the time of the reported incident. In the photo, defendant has short hair, but a majority of the witnesses said the suspect had hair that was long on the top and short on the sides. Law enforcement nevertheless used the inaccurate photo of defendant."

today." R responded, "That's him." She confirmed that she was referring to defendant, who had lifted his mask at the prosecutor's request. The prosecutor asked R if his hair was different at the time of the incident, and she answered, "Almost the same." Meanwhile, R had pointed at defendant's left arm—which she saw as he reached for his mask—saying "it's that" and asking to see it, so the prosecutor asked that defendant hold up his left arm.[5] R immediately stated, without waiting for a question, "Yes, it was like that, I was able to take a good look at it when he was grabbing my things." Defendant's tattoo is not described in the record, nor is there any record of any prior description that R had given of the perpetrator's tattoo.

Based on the foregoing evidence, defendant argued that R should be excluded from identifying him in court at trial. The trial court orally denied the motion, explaining why it was convinced that R's identification was based on her "independent recollection." It pointed to the ample opportunity that R had to observe the perpetrator and his physical characteristics while interacting with him in relaxed circumstances in a well-lit place over a period of time, then additional time to observe him in the passenger seat of her car in broad daylight. It noted that there was no evidence that R was drinking or under the influence of any substance that would interfere with her perceptions or memory. The court was impressed by R's ability to remember "a very high degree of detail" about the encounter, even as to the part when she upset and scared. She was also able to recover her phone from the perpetrator and take a video of him as he fled. R's description to the police matched defendant's appearance, and the court saw her reaction to his tattoo in court. The court viewed all of those factors as militating against the only "system variable," which was her exposure to defendant's photo in the photo lineup. Ultimately, the court was persuaded that R's identification of defendant was based on her "independent recollection" and ruled that there was a sufficient foundation for admission.

---

[5] The court put on the record that it had "observed that as [defendant] pulled down his face covering or asked the deputies to help him, the witness was pointing to [defendant's] left arm and saying that, it's that, and asked that he particularly show the tattoo on his left forearm."

Seven months later, in April 2022, defendant filed another pretrial motion to exclude R from identifying him in court at trial, arguing that R's in-court identification at the first hearing would make her in-court identification at trial less reliable. The court held a hearing, at which the only witness was Daniel Reisberg, a defense expert on the reliability of eyewitness identification.

Reisberg first addressed the reliability of eyewitness identifications in general. He described photo lineups as having an "alarmingly high error rate" of "36, 37 percent," and he described in-court identifications as having "essentially zero value," because they are functionally equivalent to a "showup,"[6] usually occur long after the fact, and are conducted in a highly suggestive manner. Researchers have worked to identify factors that affect reliability, which, he explained, some researchers divide into "system variables" and "estimator variables," although he personally prefers a four-category approach that he detailed at some length.

Reisberg was then asked to opine on those factors as applied to R in this case, based on his review of the case materials. Reisberg opined that everything about the encounter itself was "massively favorable for an accurate, reliable identification." He also had "zero concern" about how much time passed between the incident and the police photo lineup, which he understood was about two weeks. However, there were some "red flags" for him regarding the photo lineup. The police had given R an "appearance change instruction" beforehand, which tends to encourage making an identification, and also the photo lineup was "arguably suffering" from "plausibility bias," in that, from Reisberg's perspective (but "others can view the lineup for themselves"), only two photos depicted someone with hair that was longer on top than the sides, which could have pushed R toward those two photos. Under the circumstances, Reisberg stated, he would have expected R to identify the perpetrator "without any hesitation." Finally, Reisberg addressed the in-court identification in September 2021. He agreed that it was highly

---

[6] *See Lawson/James*, 352 Or at 742-43 (a police "showup" is "generally regarded as inherently suggestive," as it involves officers "present[ing] an eyewitness with a single suspect for identification," who they have obviously "targeted as a suspect").

suggestive by its nature, as well as carrying the risk inherent in multiple identifications. On the latter point, Reisberg explained that repeated identification attempts "gradually push the error rate higher and higher and higher"—even if conducted in a nonsuggestive manner—because each successive attempt, one, is farther in time from the original event and, two, makes the person more familiar with that face.

After hearing argument from the parties, the trial court again denied exclusion. It relied on essentially the same reasoning as before with respect to relevance under OEC 401 and personal knowledge under OEC 602. As for OEC 701, the court recognized the in-court identification procedure at the September 2021 hearing as an "especially problematic" system variable, and it acknowledged the photo lineup as having two potentially suggestive features (the appearance-change instruction and the haircut issue). However, it viewed the estimator variables as "overwhelming" enough, relative to the system variables, for the state to have met its burden under OEC 701:

> "Given the totality of [R's] testimony and the kind of overwhelming in the identification's favor of the estimator variables, I am going to find [under OEC] 701 that the State has met its burden by a preponderance of the evidence that this was a rationally based identification that was done in court on September 17th and that I don't have indications of unreliability that would make it inadmissible."

The court also rejected defendant's argument for exclusion under OEC 403, reiterating that the identification was sufficiently reliable to go to the jury.

C.  *Legal Analysis*

On appeal, defendant argues that the trial court should have excluded R from identifying him in court at trial under either OEC 701 or OEC 403. Regarding OEC 701, defendant argues that R's in-court identification at trial was more likely due to the suggestive identification procedure at the September 2021 hearing than her own perceptions and memory. Regarding OEC 403, defendant argues that R's identification was so unreliable as to have little probative value, whereas it carried a high risk of unfair prejudice as the accuracy of identifications procured through suggestive

procedures is resistant to testing by traditional trial methods such as cross-examination.

The state maintains that the court did not err. Regarding OEC 701, it emphasizes R's ample opportunity to observe the perpetrator in close proximity and good lighting on April 17, 2021, and the consistency between R's hearing testimony and what she told the police. The state argues that, notwithstanding the suggestiveness of the September 2021 identification procedure, the evidence as a whole supported an inference that R's identification at trial would be based on her own perceptions and memory. As to OEC 403, the state argues that the trial court did not abuse its discretion by allowing the identification, and it cites R's handling of the photo lineup as indicating that R is less susceptible to influence by suggestive circumstances.

We readily conclude that the trial court did not err in denying defendant's initial motion to exclude R from identifying him in court at trial. At the time of the first ruling in September 2021, the estimator variables were highly favorable to admission for the reasons that the court described—including the duration and circumstances of the encounter and the favorable environmental conditions—whereas the only system variable that defendant had identified at that point was R's exposure to defendant's photo in a six-photo lineup (a photo that defendant described as "inaccurate" and not reflective of his hairstyle in April 2017). We agree with the trial court that that one exposure to a photo of defendant did not require excluding R from identifying defendant in court at trial. The trial court did not err in denying defendant's initial motion.

Defendant's second motion in April 2022 raises a closer question. As the Supreme Court has explained, in-court identification by a witness at trial is analogous to a showup and thus inherently suggestive. *Hickman*, 355 Or at 741 (analogous to a showup); *Lawson/James*, 352 Or at 742-43, 783 (showups are "widely regarded as inherently suggestive"). The witness is presented with a single suspect, who is seated at the defense table, and urged by a state actor, usually the prosecutor, to declare whether that is the same person previously observed. *See Hickman*, 355 Or at 741, 741 n 11 (recognizing suggestiveness of that procedure); *accord Perry v. New*

*Hampshire*, 565 US 228, 244, 132 S Ct 716, 181 L Ed 2d 694 (2012) (all in-court identifications "involve some element of suggestion"). That suggestiveness is mitigated, albeit imperfectly, by the ordinary protections guaranteed the defendant in a criminal trial. The factfinder is able to watch the witness make the identification, the defendant may immediately cross-examine the witness in the factfinder's presence, and expert testimony is available to put the identification in context. *See Hickman*, 355 Or at 735-36 (collecting examples and noting that "[t]he principles on which those decisions rest are embedded in the profound respect that our system of justice holds for the role of juries in the adjudicative process.").

When the same procedure is used at a pretrial hearing, it is just as suggestive as it would be at trial, and there are some additional risks, as described by Reisberg at the second hearing. In a case like this one, the factfinder is not present to watch the first in-person identification and hear immediate cross-examination. Exposure to a suspect also risks source-monitoring errors, whereby a witness is unable to discern whether they recognize the suspect from the original event or from subsequent exposures. *See Lawson/James*, 352 Or at 743, 784-86. Also, multiple identifications may lead to a witness expressing "greater certainty" over time, with the jury seeing only the last identification. *Hickman* 355 Or at 735; *Lawson/James*, 352 Or at 743-45.[7]

---

[7]  The Massachusetts Supreme Court has aptly described this set of concerns:

"Where eyewitnesses before trial were unable to make a positive identification of the defendant or lacked confidence in their identification, they are likely to regard the defendant's prosecution as confirmation that the defendant is the 'right' person and, as a result, may develop an artificially inflated level of confidence in their in-court identification. Where confirmatory feedback artificially inflates an eyewitness's level of confidence in his or her identification, there is also a substantial risk that the eyewitness's memory of the crime at trial will 'improve.' As studies have shown, an eyewitness, now certain that the defendant was the perpetrator of the crime she observed, may recall that she saw the perpetrator more clearly, and saw more details of his appearance, than the witness had recalled during the nonsuggestive out-of-court identification procedure where she was unable to make a positive identification. This enhancement of memory makes it more difficult for juries to assess the accuracy of an in-court identification. As a result, not only is an eyewitness likely to have an inflated level of confidence in an in-court showup identification, but a jury may give more weight to it than to the nonsuggestive pretrial identification that yielded something less than a positive identification."

*Commonwealth v. Collins*, 470 Mass 255, 263-64, 21 NE 3d 528, 534-35 (2014) (citations and footnotes omitted).

Those risks caution against conducting eyewitness identifications during pretrial hearings, if avoidable, at least in cases where the defendant is not well known to the witness. As the Supreme Court aptly warned in *Lawson/James*:

> "[I]t is incumbent on courts and law enforcement personnel to treat eyewitness memory just as carefully as they would other forms of trace evidence, like DNA, bloodstains, or fingerprints, the evidentiary value of which can be impaired or destroyed by contamination. Like those forms of evidence, once contaminated, a witness's original memory is very difficult to retrieve; it is, however, only the original memory that has any forensic or evidentiary value."

352 Or at 748. At a minimum, the court may wish to consider alternative procedures, such as arranging a nonsuggestive lineup or having the defendant sit somewhere in the courtroom other than the defense table. *See Hickman*, 355 Or at 742-43 (referencing potential precautionary procedures that a defendant may request).

Of course, hindsight is 20/20, and such observations are of no help in this case. In this case, defendant moved to exclude in-court identification, requested a hearing, and appeared at that hearing in a jail sweatshirt and handcuffs and sitting at counsel table. It does not appear to have occurred to anyone, including defendant, until after R made the in-court identification, that, if defendant's motion was denied and R was allowed to make an in-court identification at trial, the pretrial hearing itself would become a system variable. We therefore pause to emphasize the posture of this case. We express no opinion on whether it would have been error to deny a motion asking to modify *the pretrial hearing procedures* to avoid creating a new system variable, as no such motion was made or ruled on. The only question before us is whether it was error to allow R to identify defendant in court at trial, given the totality of the estimator variables and system variables as they existed at the time of the second hearing.

Turning to that question, we conclude that the trial court did not err under OEC 701 in deciding that R's in-court identification was sufficiently reliable to survive the court's gatekeeping function and go to the jury. In a perfect world,

in a case where a witness and the defendant are strangers or minimally acquainted, the witness would have no suggestive pretrial exposures to the defendant. However, we do not understand existing case law to create anywhere near such a bright line rule. Moreover, although it appears to be generally agreed that less suggestive procedures support more reliable identifications, existing case law definitely does not prohibit traditional in-court identification. *See Hickman*, 335 Or at 736, 743 n 12 (clearly allowing the use of traditional in-court identification at trial, subject to reasonable precautions such as the *Lawson/James* procedure, and leaving open when, if ever, alternative procedures are required if requested). The fact that R had some suggestive pretrial exposure to defendant is not then, in and of itself, dispositive. A more fact-specific analysis is required.

In this case, as the trial court described in announcing its first ruling, and as defendant's own expert testified at the second hearing, the estimator variables were highly favorable to reliability—or, to use the expert's words, "massively favorable for an accurate, reliable identification."

Meanwhile, the only clearly negative system variable was R's in-court identification at the September 2021 hearing. Defendant also made an argument about the police photo lineup, but the trial court appears to have given little, if any, weight to the potentially suggestive aspects of the photo lineup, which the record supports, in that the "appearance change instruction" did not in fact influence R to make an identification, and in that defendant had a different hairstyle in the photo lineup than in April 2017 (as acknowledged by his counsel in the first motion). Focusing then on the September 2021 hearing as a system variable, the identification procedure used at the hearing was highly suggestive, being functionally equivalent to a showup, and also carried the risk inherent in repeat exposure to a suspect. Something was certainly lost by having R's first in-court identification witnessed by the trial judge overseeing the pretrial hearing, instead of the jury that would assess R's credibility at trial, including while she made an in-court identification of the perpetrator. For all of the reasons previously described, that system variable was, as the trial court described it, "especially problematic."

We ultimately agree with the trial court, however, that the highly favorable estimator variables allowed it to conclude that R's identification at trial would likely be based on her own perceptions and memory, rather than being the result of the suggestive identification procedure at the September 2021 hearing. In addition to the record itself, as detailed above, we note that the trial court witnessed R's in-court identification at the September 2021 hearing, listened to the audio of that hearing at the April 2022 hearing, and presumably took into account its own perceptions in deciding that the identification was reliable enough to go to the jury. We hold that the trial court did not err in ruling that R's identification was admissible under OEC 701.

Finally, defendant also challenges the OEC 403 ruling. *See* OEC 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."). Considering the same factors already discussed, the trial court concluded that the probative value of R making an in-court identification was not substantially outweighed by the risk of unfair prejudice. The court did not abuse its discretion in so ruling. The court understood the risk of unfair prejudice at issue, as well as the probative value of an in-court identification. The court made clear that defendant would be free to make arguments to the jury regarding the reliability of R's identification and how much weight to give it, including calling an expert witness. On this record, we cannot say that the court abused its discretion in allowing the identification under OEC 403. *See, e.g.*, *Lawson/James*, 352 Or at 767-68 (risk of unfair prejudice was "negligible" where the witnesses had clear opportunities to observe the perpetrators, could describe them with particularity, and those descriptions closely matched the arrestees); *Harrell*, 292 Or App at 355 (parking lot showup was not so inherently suggestive that the risk of unfair prejudice outweighed the probative value, where identification was based on up-close and recent observation of the defendant).

Affirmed.